**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| STEADFAST INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2736 |
| | § | |
| SMX 98, INC. and SPAW MAXWELL | § | |
| COMPANY, L.P., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This dispute is based on an insurer's attempt to charge its insured an additional $518,000 – more than twice the original premium amount – after the policy's effective dates but during the period in which claims could arise. The additional charge is based on an endorsement requiring the insured, a construction company, to require its subcontractors to have commercial general liability insurance policies that met certain conditions. Those conditions included that the subcontractors' policies have certain coverages and limits, name the insured as an additional insured, and be issued by insurance companies with an "'A+' Best rating or better." The endorsement stated that a failure to comply would not change the insured's coverage but would result in the subcontractors being considered "to be [the insured's] employees for the purpose of computing rate and premium and such premium will be charge [sic] at a rate of: $20 per $1,000 of uninsured/uninsured sub cost." Claiming that an audit revealed that some of the insured's subcontractors did not have insurance that met all the endorsement's conditions, the insurer sued for breach of contract. The insurer seeks $518,212.22 based on the amount of the noncompliant subcontracts. In cross-motions for summary

1

judgment and related motions relating to the summary judgment evidence, the parties ask this court to determine what the endorsement means, whether its damages provision is enforceable, and whether the insurer is entitled to recover the $518,212.22 sought.

The insurer, Steadfast Insurance Company, has sued its insureds, SMX 98, Inc. and SpawMaxwell Company, L.P. (together, "SpawMaxwell"). Steadfast seeks a judgment requiring SpawMaxwell to pay $518,212.22 for SpawMaxwell's alleged failures to comply with a policy endorsement requiring that all subcontractors working on construction projects during the 2002-2003 policy period maintain general liability insurance with policy limits of $1 million or more issued by a company with an "A+" Best rating or better. Steadfast has moved for summary judgment that the damages provision in the endorsement is enforceable; that SpawMaxwell breached the conditions of the endorsement because many of its subcontractors either had no insurance or had insurance with carriers with Best ratings below "A"; and that the amount due under the "$20 per $1,000 of uninsured/uninsured sub cost" formula is $518,212.22. (Docket Entry No. 36). SpawMaxwell responded, (Docket Entry No. 42), and cross-moved for partial summary judgment that the endorsement only applies to "uninsured" subcontractors who have no insurance, rather than "underinsured" subcontractors whose insurance is with companies with Best ratings below "A+"; and that if the damages provision in the endorsement applies to breaches based on both uninsured and underinsured subcontractors, it is a liquidated damages clause that is an unenforceable penalty. (Docket Entry No. 37). Steadfast responded to SpawMaxwell's cross-motion for partial summary judgment and moved to strike the affidavit of SpawMaxwell's expert on actuarial rates in insurance policies. (Docket Entry Nos. 40, 41). Steadfast argued that the expert was not timely designated and his opinions were irrelevant because the amount of the "surcharge" at issue did not result from

2

the application of actuarial principles.  (Docket Entry No. 40 at 3–6).  Steadfast also replied to SpawMaxwell's response to Steadfast's motion for summary judgment, (Docket Entry No. 46), and SpawMaxwell filed a surreply, (Docket Entry No. 49).  SpawMaxwell filed a reply to Steadfast's response to the motion for partial summary judgment, (Docket Entry No. 45), and Steadfast surreplied, (Docket Entry No. 48).[1]

The dispute over SpawMaxwell's expert witness on actuarial rates is the basis of the following motions: SpawMaxwell's motion for leave to file expert designation, (Docket Entry No. 27); Steadfast's opposition to the motion for leave, (Docket Entry No. 31; Docket Entry No. 33); Steadfast's motion to strike the expert's affidavit from the summary judgment record, (Docket Entry No. 41); SpawMaxwell's response to the motion to strike, (Docket Entry No. 43); Steadfast's reply, (Docket Entry No. 47); SpawMaxwell's surreply, (Docket Entry No. 51); and Steadfast's "further reply," (Docket Entry No. 53).

The parties also dispute the content of the pleadings.  SpawMaxwell has moved for leave to amend its answer, (Docket Entry No. 24), which Steadfast has opposed, (Docket Entry No. 28).  SpawMaxwell replied to Steadfast's opposition, (Docket Entry No. 34), and Steadfast surreplied, (Docket Entry No. 35).

After a careful review of the motions, the responses, the record, and the applicable law, this court grants SpawMaxwell's motion for leave to designate experts and denies Steadfast's motion to strike the expert report and affidavit of the expert on actuarial rates, rejecting Steadfast's arguments based on delay and on relevance.  This court denies Steadfast's motion for summary judgment and grants  SpawMaxwell's motion for partial summary judgment in part, finding that if

---

[1] Steadfast appears to have filed one of its surreplies twice, as both Docket Entry Nos. 48 and 52.  The second filing appears to have attached an exhibit.  (*See* Docket Entry 52).

the damages provision of the endorsement is interpreted to cover both uninsured subcontractors and subcontractors who have insurance issued by companies that have Best ratings of below "A+", as Steadfast argues, it is an unenforceable liquidated damages provision.  SpawMaxwell's motion for partial summary judgment is denied to the extent it seeks a dismissal of Steadfast's breach of contract claims.  Finally, this court grants SpawMaxwell's motion for leave to file an amended answer.

The reasons for these rulings are set out below.  A hearing to set a schedule to resolve the remaining claims is set for **January 16, 2008, at 5:00 p.m.**, in Courtroom 11-B.

## I.    Factual Background

Steadfast is a surplus lines insurer.  (Docket Entry No. 36, Ex. A at 1).  SpawMaxwell sought to renew its Steadfast policy for the 2002–2003 year by submitting applications through an insurance agent, Insurance Associates of the Southwest ("IAS"), to broker Heath Insurance Brokers, Inc. ("Heath").  (*Id.* at 2, Ex. A at SFI 000202–216).  On May 8, 2002, Heath sent Steadfast a renewal proposal.  (*Id.*, Ex. A at SFI 000217–218).  On May 28, 2002, Steadfast sent Heath a quote. (*Id.*, Ex. A at SFI 000220–225).  The quote identified "Notable Endorsements" in a section entitled "Amendments to Coverage."  The "Notable Endorsements" included "Subcontractor's warranty ($1/1 limits w/ A+ carrier to be met or surcharge of $20 rate x uninsured/underinsured sub costs)." (*Id.*, Ex. A at SFI 000224).  On May 28, 2002, Heath sent the Steadfast renewal quote to IAS, SpawMaxwell's agent, and IAS accepted the quote.  (*Id.*, Ex. A. at SFI 000236).

On May 29, 2002, Heath issued a binder for the insurance coverage.  (Docket Entry No. 36, Ex. A at SFI 000226–228).  Like the quote, the binder contained an "Amendments to Coverage" section, which included a reference to the subcontractors warranty endorsement.  (*Id.*, Ex. A at SFI

4

000227).  Heath sent the binder to IAS the same day.  (*Id.*, Ex. A at SFI 000230–235).  On June 14,

2002, Heath sent the permanent insurance policy to IAS.  (*Id.*, Ex. A. at SFI 000229).  The cover

letter enclosing the policy asked that IAS review the policy and advise Heath immediately if there

were any corrections, omissions, or changes.  (*Id.*).

Steadfast issued SpawMaxwell commercial general policy number SCO 5215529-01 ("the

Policy") with effective dates of May 29, 2002 through May 29, 2003.  (Docket Entry No. 36, Ex.

B).  The Policy included Endorsement Number 10, the Subcontractors Maintenance of Liability

Limits Endorsement ("Subcontractors Warranty Endorsement").  (*Id.*, Ex. B at SFI 000067–68).  The

Subcontractors Warranty Endorsement provided that SpawMaxwell would require all subcontractors

shown on the "Schedule of Designated Subcontractors" to:

> (a)  Maintain Commercial General Liability insurance coverage
> provided by: an insurance company with "A+" Best rating or better;
>
> (b)  Provide minimum limits as respects Coverage A.  Bodily injury
> or Property damage of $1,000,000 for Each Occurrence.  $1,000,000
> General Aggregate, $1,000,000 Products Completed Operations
> Aggregate;
>
> (c)  Have you [SpawMaxwell] added to their policies as an Additional
> Insured in accordance with a. and b. above;
>
> (d)  Provide you with Certificates of Insurance showing the coverage
> requirements indicated in a., b., and c. above.

(*Id.*, Ex. B at SFI 000067).  The Subcontractors Warranty Endorsement stated that failure to comply

with these conditions would not alter the coverage the policy provided.  Failure to comply, however,

would result in Steadfast considering the noncompliant independent subcontractors to be

SpawMaxwell's employees for the purpose of computing "rate and premium and such premium will

be charge [sic] at a rate of $20 per $1,000 of uninsured/uninsured sub cost," (the "premium-charge

provision"). (*Id.*, Ex. B at SFI 000068). The Endorsement also stated that the subcontractors' insurance naming SpawMaxwell as an additional insured would be considered primary insurance, with the Steadfast Policy excess to the limits of the subcontractor insurance limits. (*Id.*).

After the policy period ended, Steadfast audited the subcontractors' insurance. Steadfast concluded that SpawMaxwell had failed to comply with the Subcontractors Warranty Endorsement by having subcontractors with either no insurance or with insurance issued by carriers with Best ratings lower than "A." (Docket Entry No. 36, Ex. C). SpawMaxwell paid Steadfast $41,196 for those subcontracts that had no insurance at all. SpawMaxwell paid this amount based on an invoice from Steadfast that calculated the premium for contracts with no insurance using the Endorsement premium-charge formula of $20 per $1,000 of "subcost." (*See id.* at 5, Ex. D at 3; Docket Entry No. 37 at 2). Steadfast asserts that it is entitled to an additional $518,212.22 for those subcontracts in which the subcontractors had insurance but the insurers were rated below "A" or "A+".[2] Steadfast demanded payment in a letter dated October 25, 2004. (Docket Entry No. 36, Ex. B at SFI 000028). SpawMaxwell refused to pay, and, on August 23, 2006, Steadfast filed suit.

Steadfast moves for summary judgment that (1) the Subcontractors Warranty Endorsement is enforceable as a matter of law, and (2) that SpawMaxwell breached and owes $518,212.22 in surcharge. (Docket Entry No. 36). SpawMaxwell cross-moves for partial summary judgment that "uninsured" as used in the Subcontractors Warranty Endorsement cannot also mean "underinsured";

---

[2] Steadfast appears to have changed its position as to whether it seeks to recover the premium amount for those subcontractors insured by companies rated below "A+" or only those insured by companies rated below "A." Although the Subcontractors Warranty Endorsement contains a requirement that the subcontractors be insured by companies rated "A+" or better and Steadfast's amended complaint references this requirement, Steadfast's audit appears to note as inadequately insured only those subcontractors insured by companies rated "A-" or below. Steadfast's summary judgment motion appears to seek recovery only for those subcontracts insured by companies rated "A-" or below. (*See* Docket Entry No. 36 at 16). Steadfast notes that its summary judgment motion should not be read to constitute a waiver of its right to seek additional amounts from a jury and that Steadfast may evaluate additional charges based on those subcontractors insured by companies with an "A" rating. (*Id.* at 17 n.2).

that the premium-charge provision in the Subcontractors Warranty Endorsement is an unenforceable liquidated damages clause, and that the premium-charge provision is illegal under Texas law or void as against public policy.  (Docket Entry No. 37).

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An issue is material if its resolution could affect the outcome of the action.'"  *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## B.     Contract Interpretation

The interpretation of insurance polices is governed by the same rules that govern construction of other written contracts. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) (citation omitted).[3]  A court's primary concern in construing a contract is to determine the party's intent. *Harrison v. Great Am. Assurance Co.*, 227 S.W.3d 890, 893 (Tex. App.—Dallas 2007, no pet. h.).  Terms in an insurance contract will be given their ordinary meaning unless the

---

[3]  The parties appear to agree that Texas law applies.  The contract at issue was issued as a surplus lines insurance contract pursuant to the Texas insurance statutes, (*see* Docket Entry No. 36, Ex. A at SFI 000226); Steadfast has made arguments based on Texas contract law, (*see, e.g.*, Docket Entry No. 40 at 7); and SpawMaxwell also cites Texas law regarding its argument that the premium-charge provision is unenforceable, (*see, e.g.*, Docket Entry No. 37 at 2).

policy shows that the words were meant in a different sense.  *Sec. Mutual Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979).  Whether an insurance contract provision is enforceable is a question of law.  *Valley Reg'l Med. Ctr. v. Wright*, 276 F. Supp. 2d 620, 633 (S.D. Tex. 2001) (citing *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 678 (Tex. App.—Houston [1st Dist.] 1996, no writ)).

### III.    The Enforceability of the Premium-Charge Provision of the Subcontractors Warranty Endorsement

Steadfast seeks summary judgment on the basis that the premium-charge provision of the Subcontractors Warranty Endorsement is simply a "surcharge" for noncompliance.  (Docket Entry No. 36 at 10–12).  SpawMaxwell cross-moves for partial summary judgment that the provision is a liquidated damages clause that imposes an unreasonable penalty and is therefore unenforceable.  (Docket Entry No. 42 at 5–10).  "Whether a contract term is a liquidated damages provision is a question of law for the court to decide."  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 664 (Tex. 2005) (citation omitted).

Steadfast does not argue that the premium-charge provision in the Subcontractors Warranty Endorsement would pass the liquidated damages enforceability analysis, but rather argues that such analysis is inapplicable because the provision is not a liquidated damages clause.  (*See* Docket Entry No. 40 at 14–15).  Steadfast opposes SpawMaxwell's use of opinions by its expert on actuarial rates, Dr. Mark Crawshaw, on the ground that the premium-charge provision of the Subcontractors Warranty Endorsement was not set using any actuarial rates, making his opinions irrelevant as well as untimely.  (*See id.* at 3–6).

In both the response to Steadfast's motion for summary judgment and in the motion for partial summary judgment, SpawMaxwell argues that the premium charge for noncompliance with the Subcontractors Warranty Endorsement is a liquidated damages clause.  SpawMaxwell supports

its argument that the liquidated damages provision is an unreasonable penalty with the opinion of Dr. Crawshaw, who examined how the amount set by the formula "$20 per $1,000 of uninsured/uninsured sub cost" applied to the insurance obtained by the SpawMaxwell subcontractors.  Dr. Crawshaw concluded that the amount was unreasonable if it applied to all subcontractors insured by companies with Best ratings below "A" or "A-".  Resolving the cross-motions for summary judgment requires analyzing whether the premium-charge provision in the Subcontractors Warranty Endorsement is a liquidated damages provision and whether the provision is an unenforceable penalty.

### A.    Is the "Premium Charge" Provision of the Subcontractors Warranty Endorsement a Liquidated-Damages Clause?

"Liquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations . . . ."  *Valence*, 164 S.W.3d at 664.  Steadfast argues that the Subcontractors Warranty Endorsement is not a liquidated damages clause because it is a "surcharge."  The Texas Department of Insurance defines a "surcharge" as "an extra charge added to your premium by an insurance company."  Tex. Dept. of Ins. Glossary – Common Insurance Terms, http://www.tdi.state.tx.us/consumer/glossary.html (last visited Jan. 2, 2008). Steadfast does not explain why such an extra charge could not be a form of liquidated damages or why the Department of Insurance definition precludes construing the provision at issue as a liquidated damages clause.

The *Valence* court's analysis shows why the premium-charge provision of the Subcontractors Warranty Endorsement is a liquidated damages clause.  In *Valence*, the court analyzed a contractual provision stating that if a party decided not to participate in a proposed exploration project, it became a "non-consenting party" subject to a "non-consent penalty."  The consequence of "non-

10

consenting party" status was relinquishment of the party's interest in the well and its share of the proceeds until the proceeds equaled a certain amount. *Valence*, 164 S.W.3d at 663–64. The court found that despite the use of the word "penalty," this provision was not a penalty for contract breach, but rather an agreement to give up a return on an investment the party chose not to make. *Id.* at 664. The parties who chose to participate received additional proceeds for taking the risk of the project. The nonconsenting parties relinquished their well interest and proceeds share until the proceeds reached a certain level. The *Valence* court emphasized that a party's decision not to participate was not a breach of the contract because the contract did not require the parties to contribute to the operation costs. As a result, the provision could not be a liquidated damages provision that applied in the event of a contract breach. *Id.* at 665.

By contrast, the Subcontractors Warranty Endorsement does not allow SpawMaxwell to decide whether to have the subcontractors comply with the insurance requirements. If SpawMaxwell fails to require all subcontractors shown in the Schedule of Designated Subcontractors to obtain insurance with at least the specified coverage and limits, from companies with at least an "A+" Best rating, SpawMaxwell breaches the insurance contract. (Docket Entry No. 36, Ex. B at SFI 000067–68). The premium-charge provision sets in advance the damages SpawMaxwell must pay for failing to comply with the Subcontractors Warranty Endorsement requirements on subcontractors' insurance, including the requirement that subcontractors' insurers have a Best rating of "A+" or better. The premium-charge provision in the Subcontractors Warranty Endorsement fits squarely within the definition of a liquidated damages provision.

Steadfast argues that the premium surcharge for breach of the Subcontractors Warranty Endorsement does not have the characteristics of a liquidated damages provision because the amount is not fixed in advance. (Docket Entry No. 40 at 11). Instead, the amount varies depending on the

11

dollar amount of subcontracts not insured by policies meeting the conditions set in the Subcontractors Warranty Endorsement. (*Id.* at 11–14).  The fact that the exact amount of the damages is not fixed in advance, but rather varies depending on the amount of "uninsured/uninsured sub cost," is consistent with liquidated damages.  Liquidated damages provisions fix in advance the payment for breach, but the amount may be expressed as either a sum certain or as a rate or formula that contains one or more variables.  Examples are construction contracts with per diem charges for delay, in which the amount is unknown because the extent of delay is unknown, or leases with charges for each month of breach in which the number of months is unknown.  *See, e.g.*, *Stewart v. Basey*, 245 S.W.2d 484, 485–86 (Tex. 1952) (applying the penalty analysis to a liquidated damages clause under which the specific amounts varied based on the length of time of the breach by requiring lessors to pay a certain amount of damages for every month the breach continued); *Technip Offshore Contractors v. Williams Field Servs.*, No. H-04-0096, 2006 WL 581273, at *5 (S.D. Tex. March 7, 2006) (analyzing as liquidated damages a provision that provided specified damages to be assessed for each day of breach).

The premium-charge provision of the Subcontractors Warranty Endorsement sets out a formula to calculate the amount SpawMaxwell will have to pay for failing to require its subcontractors to obtain insurance that meets the conditions set out in the Endorsement.  The formula is "$20 per $1,000 of uninsured/uninsured sub cost."  The formula "fixes in advance" the damages for breach; the fact that the precise amount is not established in advance is consistent with a liquidated damages provision.

Steadfast argues that the premium-charge provision of the Subcontractors Warranty Endorsement is a "surcharge," analogous to late fees insurers charge for late payment of premiums. (*See* Docket Entry No. 36 at 11; Docket Entry No. 40 at 17).  Steadfast cites *Domizio v. Progressive*

*County Mut. Ins. Co.*, 54 S.W.3d 867, 875 (Tex. App.—Austin 2001, pet. denied), for the proposition that "late fees charged by insurer for insureds' delay in making installment payments of premiums did not constitute an unenforceable liquidated damages penalty." (Docket Entry No. 36 at 11; Docket Entry No. 40 at 17–18). The *Domizio* court did not analyze whether the late fees in that case constituted an unenforceable liquidated damages penalty. Rather, the *Domizio* court stated that the party challenging the clause had "failed to marshal a scintilla of probative evidence to raise a genuine issue of material fact as to this alleged cause of action for which appellants would have the burden of proof at trial." *Domizio*, 54 S.W.3d at 875. In addition, contrary to Steadfast's assertion, late fees are not necessarily exempt from the penalty analysis applicable to liquidated damages clauses. *See Hill v. Telecom*, No. 198CV51-D-D, 2000 WL 264325, at *2 (N.D. Miss. March 2, 2000) (denying the plaintiffs' request to invalidate a late fee provision as an unenforceable penalty because the plaintiffs had already paid the late fees, barring their claim under the voluntary payment doctrine, but not ruling out the possibility of applying the penalty analysis to late fees in general).

The premium-charge provision in the Subcontractors Warranty Endorsement applies to set damages if SpawMaxwell breaches its obligation to require its subcontractors to maintain specified insurance coverage. The cases do not require that a provision establishing damages or a "surcharge" for a failure to comply with contractual conditions use the words "breach" or "penalty" to identify a liquidated-damages clause. Indeed, Steadfast moves for summary judgment that SpawMaxwell owes $518,212.22 because it breached the Subcontractors Warranty Endorsement of the insurance contract. (Docket Entry No. 36 at 17). The premium-charge provision of the Subcontractors Warranty Endorsement is subject to the penalty analysis that applies to liquidated damages clauses.

### B.      Is the Premium-Charge Provision an Unenforceable Penalty?

13

To determine whether a provision that fixes damages in advance of a breach is an unenforceable penalty, a court examines whether

> (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

> (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

*Stewart*, 245 S.W.2d at 486 (quoting RESTATEMENT OF CONTRACTS § 339) (internal quotation marks omitted). The first prong requires analyzing whether the premium-charge provision setting a formula of $20 per $1,000 of "uninsured/uninsured sub cost" is a reasonable forecast of compensation for the harm caused by SpawMaxwell's failure to require all its subcontractors to obtain insurance that meets the conditions of the Subcontractors Warranty Endorsement. This in turn requires analyzing the premium-charge provision to determine whether it requires payment of the $20 per $1,000 additional premium only for those subcontracts that are not insured at all, or whether it also requires payment for subcontract amounts as to which the subcontractors had insurance issued by companies with Best ratings of "A-" or below.

### 1. Does the Premium-Charge Provision of the Endorsement Apply to both "Uninsured" and "Underinsured" Subcontractors?

SpawMaxwell argues that the Subcontractors Warranty Endorsement only requires the additional premium of $20 per $1,000 for "uninsured" subcontracts. SpawMaxwell asserts that it has paid this amount. Steadfast argues that the Subcontractors Warranty Endorsement requires the additional premium for both uninsured subcontracts and subcontracts with insurance that does not meet the Endorsement's conditions, including the condition of an insurer with a Best rating of "A+" or better.

14

SpawMaxwell emphasizes the sloppily written language in the Subcontractors Warranty Endorsement: "such premium will be charge [sic] at a rate of: $20 per $1,000 of uninsured/uninsured sub cost."  SpawMaxwell cites to the dictionary definition of "uninsured" as: "(1) *adj.* 'not covered by insurance;' and (2) *n.* 'a party that is not insured.'"  (Docket Entry No. 42 at 5).  SpawMaxwell asserts that the policy should be construed against Steadfast and that if "uninsured/uninsured" does not mean "uninsured," at a minimum it creates an ambiguity that should preclude summary judgment.  (*Id.*).  Steadfast responds that examining the language in the context of the entire Policy makes it clear that "uninsured/uninsured" means both: (1) wholly without insurance; and (2) with insurance that breaches the Subcontractors Warranty Endorsement's conditions.  (Docket Entry No. 46 at 5, 7).

Under Texas law, the same rules that apply to contracts in general govern the interpretation of insurance contracts.  *See Nat'l Union Fire Ins. Co. v. CBI Indus. Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citations omitted).  Absent ambiguity, contract interpretation is for the court to decide as a matter of law.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (citations omitted).  When interpreting a contract, the court's primary concern "is to ascertain and to give effect to the intentions of the parties as expressed in the instrument."  *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980) (citation omitted).  To achieve this objective, the court considers the contract as a whole.  *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994) ("This court is bound to read all parts of a contract together to ascertain the agreement of the parties.  The contract must be considered as a whole . . . [and] each part of the contract should be given effect.") (internal citations omitted).  When considered as a whole, a contract is ambiguous only if "it is reasonably susceptible to more than one meaning."  *Coker*, 650 S.W.2d at 393 (citation omitted).  As Texas courts have recognized, "not every difference in the interpretation of a contract

or an insurance policy amounts to an ambiguity." *Forbau*, 876 S.W.2d at 134.  A court will not find

a contract ambiguous if it may properly be given a certain legal meaning or interpretation.  *CBI*

*Indus.*, 907 S.W.2d at 520 (citations omitted).  Although a court construes ambiguities in an

insurance contract against the insurer, *see Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*,

811 S.W.2d 552, 555 (Tex. 1991), it does not "strain to find" such ambiguities, if, in so doing, it

would defeat the probable intentions of the parties.  *Sharp v. Fed. Sav. & Loan Ins. Corp.*, 858 F.2d

1042, 1045 (5th Cir. 1988) (quoting *Calcasieu-Marine Nat'l Bank v. Am. Employers' Ins. Co.*,

533 F.2d 290, 296 (5th Cir. 1976)); *see also Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 918

(Tex. App.—Fort Worth 1988, writ denied).

     Analyzing the Subcontractors Warranty Endorsement and Policy as a whole leads to the

conclusion that the "$20 per $1,000 of uninsured/uninsured sub cost" premium-charge provision

applies to SpawMaxwell's failure to have all its subcontractors obtain insurance that meets the

Endorsement's conditions.  This includes the failure to obtain insurance or to obtain insurance at the

specified coverage amounts provided by an insurance company with an "A+" Best rating or better.

The Subcontractors Warranty Endorsement states: "The insurance provided by this policy is subject

to the following additional provisions, which in the event of conflict with any provisions elsewhere

in the policy shall control the application of insurance to which this endorsement applies." (Docket

Entry No. 36, Ex. B at SFI 000067).  It further states: "You will require that all subcontractors

shown in the Schedule of Designated Subcontractors, while performing operations for [sic] during

the period of their contract with you will: a. Maintain Commercial General Liability insurance

coverage provided by: an insurance company with an 'A+' Best rating or better . . . ." (*Id.*).  The

premium-charge provision of the Subcontractors Warranty Endorsement states: "Your *failure to*

*comply with the conditions above* will not alter the coverage provided by this policy.  However,

*should you fail to comply*, we will consider such independent subcontractors to be your employees for the purpose of computing rate and premium and such premium will be charge [sic] at a rate of: $20 per $1,000 of uninsured/uninsured subcost." (*Id.*, Ex. B at SFI 000068 (emphasis added)).  The Subcontractors Warranty Endorsement sets out the requirements for the insurance that all SpawMaxwell subcontractors listed on the schedule of designated subcontractors, "while performing operations for [sic] during the period of their contract with you," must maintain.  The Endorsement then sets out the formula to calculate the added premium that SpawMaxwell will have to pay for the subcontractors who do not comply with the insurance requirements.  The Endorsement evidences the parties' intent to require SpawMaxwell to pay Steadfast $20 per $1,000 of subcontract cost as to which the subcontractors failed to maintain insurance that meets the Endorsement's conditions. The added-payment obligation does not only apply to those subcontract amounts for which there is no insurance at all.  To limit the added-payment obligation to subcontract amounts that are wholly uninsured ignores the fact that the Endorsement not only requires insurance, but requires insurance of certain amounts and coverages, issued by insurers with certain ratings.  Interpreting the added-payment provision to apply only to subcontracts for which subcontractors have obtained no insurance at all would vitiate the requirement that all subcontractors meet all the insurance conditions and the provision that failure to comply with those conditions will result in the added charge.

This interpretation is supported by the binder for coverage, which states that one of the "Amendments to Coverage" is "Subcontractor's Warranty ($1/1 limits w/A+ carrier to be met or surcharge of $20 rate X uninsured/underinsured sub cost)."  (Docket Entry No. 36, Ex. A at SFI 000227 (emphasis added)).  The same statement, referencing both "uninsured" and "underinsured," is listed under "Amendments to Coverage" in the quote Steadfast sent to Heath, which Heath in turn

17

sent to Defendants' agent IAS.  (Docket Entry No. 36, Ex. A at SFI 000221; *see also* Docket Entry No. 36, Ex. A at SFI 000224).  The Subcontractors Warranty Endorsement's omission of the word "uninsured" appears to be a typographical or clerical error.  The premium-charge provision should be interpreted in accordance with the parties' clear intentions.  *See City of Galveston v. Galveston Mun. Police Ass'n*, 57 S.W.3d 532, 539 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("'Obviously, this typographical mistake *must* yield to the well-established doctrine that written contracts will be construed according to the intention of the parties, notwithstanding errors and omissions, by perusing the entire document and to this end, *words, names, and phrases obviously intended may be supplied*.'") (quoting *Ussery Invs. v. Canon & Carpenter, Inc.*, 663 S.W.2d 591, 593 (Tex. App.—Houston [1st Dist.] 1983, writ dism'd)) (emphasis added by *City of Galveston* court); *Marathon Oil Co. v. Edwards*, 96 S.W.2d 551, 553 (Tex. Civ. App.—Amarillo 1936, writ dism'd) ("'A contract must be read in accordance with the intentions and understanding of the parties, notwithstanding clerical errors and omissions; and a party will be held to that meaning which he knew the other party to the contract understood the contract to mean.'") (quoting *Beckham et al. v. Scott*, 140 S.W. 80, 83 (Tex. Civ. App.—Dallas 1911, no writ)).

SpawMaxwell argues that to interpret the premium-charge provision of the Subcontractors Warranty Endorsement to apply to any breach of the conditions applicable to subcontractors' insurance in the Endorsement is inconsistent with the provisions stating that the Steadfast insurance is excess to the policy limits of the subcontractors' primary coverage.  (*See* Docket Entry No. 45 at 7–8).  SpawMaxwell argues that if it breaches the Endorsement by having a subcontractor with no insurance, paying the $20/$1,000 additional premium essentially purchases primary insurance from Steadfast to cure the breach.  (*Id.* at 7).  If, however, the breach is that a subcontractor has obtained insurance from an insurer with a Best rating of less than "A" or "A+", this subcontractor is still

18

supplying primary insurance.  SpawMaxwell argues that if it is required to pay $20 per $1,000 for such subcontracts, it will essentially be paying Steadfast to provide primary insurance, despite the fact that the subcontractor has provided primary insurance and the Policy states that Steadfast will only provide excess insurance.  (*Id.* at 7–8).  SpawMaxwell argues that if the subcontractor is insured, Steadfast would not "reject the subcontractor's insurance and inject itself as the primary insurer to cover the claim," even if the insurer was rated "A-" or less.  (*Id.* at 7).  SpawMaxwell contends that Steadfast's interpretation that the premium-charge provision in the Subcontractors Warranty Endorsement applies to all breaches of the Endorsement would require SpawMaxwell to purchase primary insurance from Steadfast that Steadfast is neither required nor likely to provide. (*Id.* at 8).

SpawMaxwell's argument fails to take into account the fact that Steadfast's risk may increase not only when SpawMaxwell breaches the Endorsement by having subcontractors with no insurance, but also if SpawMaxwell breaches by having subcontractors who fail to obtain insurance that meets all the conditions set out in the Endorsement.  Whether the premium-charge provision is an unenforceable penalty because it does not reasonably estimate the amount of the increased risk resulting from a breach – by, for example, requiring SpawMaxwell to pay a premium for insurance even though the subcontractor is already providing it and even though Steadfast is only required to provide insurance that is excess to the subcontractor's primary coverage – is a separate question from whether the provision applies to both types of breach.  Even if Steadfast is only required to provide insurance that is excess to the subcontractors' primary coverage, Steadfast may face additional exposure if the subcontractors do not maintain insurance that satisfies the Subcontractors Warranty Endorsement conditions, including those involving the Best ratings of insurers. Interpreting the premium-charge provision to apply to all breaches of the Endorsement insurance

requirements, not merely to a subcontractor's failure to obtain any insurance, is consistent with the

fact that the Endorsement requires not only insurance, but insurance that meets certain conditions.

Reading the contract as a whole, this court determines that the "$20 per $1,000 of

uninsured/uninsured sub cost" is reasonably interpreted to apply to subcontracts as to which the

subcontractors have not complied with the Endorsement conditions for insurance, including that the

insurance was not issued by a company with an "A+" Best rating or better.  Having adopted the

interpretation of the premium-charge provision in the Endorsement advocated by Steadfast, the next

issue is whether that provision is an unenforceable penalty.

### 2.    Does the Provision Reasonably Forecast Compensation for the Contract Breach?

In the motion for partial summary judgment, SpawMaxwell concedes that the premium-

charge provision in the Subcontractors Warranty Endorsement "is a reasonable forecast of just

compensation for a wholly uninsured subcontractor where the chance that a subcontractor's primary

insurer will be unable to pay a claim is 100% (*i.e.*, there is no insurance)."  (Docket Entry No. 37

at 3).  SpawMaxwell has paid the $20 per $1,000 of subcontract amounts for which the subcontracts

did not have a certificate of insurance or were not insured at all.  (*Id.*).  SpawMaxwell argues that

the $20 per $1,000 formula is unreasonable if it is applied to subcontracts as to which the

subcontractor obtained insurance but the insurer had a rating below "A+ or better."   (*Id.*).

SpawMaxwell submits the report of its actuarial expert, Dr. Mark Crawshaw, in arguing that there

are significant differences in the risks between a "secure" Best rating—from "A++" and "A+"

("superior"), to "A" and "A-" ("excellent"), to "B++" and "B+" ("good")—and a "vulnerable" Best

rating—from "B" and "B-" ("fair"), to "C++" and "C-" ("marginal") , to "C" and "C-" ("weak"),

to "D" ("poor").  SpawMaxwell argues that the "[w]hen the subcontractor is insured, the chance that

a subcontractor's primary insurer will be unable to pay a claim is only 2.19% to 21.73% (AM Best

ratings of 'A' to 'D,' respectively)."  (*Id.* (citing Docket Entry No. 37, Ex. B at Appendix MC-B)).

Again relying on Dr. Crawshaw, SpawMaxwell argues that the outer bounds of a reasonable charge

for subcontractors who obtain insurance from companies with Best ratings below "A" are $.26 for

"A-", $.69 for "B++" and "B+", and $4.21 for "D".  (*Id.* (citing Docket Entry No. 37, Ex. B at MC-

1)).  SpawMaxwell argues that because the Endorsement charges an additional premium calculated

at $20 per $1,000 of subcontract cost if the subcontractor's insurance failed to comply with any of

the conditions, it is unreasonably excessive when applied to the failure to obtain insurance from an

insurer with a Best rating of "A+" or better, by amounts ranging from 375% to 7,592%, depending

on the subcontractor's insurer's Best rating.  (*See id.* at 4).  SpawMaxwell points out that in response

to discovery requests, Steadfast failed to identify a single claim made or damages sustained as a

result of any subcontractor failing to obtain insurance from an insurer with a Best rating of "A+" or

better.  (*See* Docket Entry No. 42 at 7).  SpawMaxwell concludes that the $518,212.22 Steadfast has

demanded for the contract breach of failing to require all subcontractors to obtain insurance from

insurers with Best ratings of at least "A" or "A+" is a windfall equal to twice the Policy's premium,

an amount unrelated to, and far in excess of, any just compensation for the breach.   (*Id.*).

SpawMaxwell contends that a breach consisting of a subcontractor obtaining insurance from an

insurer with an "A-" or "A" Best-rated company is relatively unimportant compared to a

subcontractor with no insurance.  (*Id.*).  "'Since such a contract promises the same reparation for the

breach of a trivial or comparatively unimportant stipulation as for the breach of the most important

one or of the whole contract, it is obvious that the parties have <u>not</u> adhered to the rule of just

compensation.'"  (*Id.* at 8 (quoting *Stewart*, 245 S.W.2d at 486)).

Steadfast responds in part by arguing that because SpawMaxwell agreed to the Subcontractors Warranty Endorsement, it is not an unenforceable penalty.  This is unpersuasive.  Courts have refused to enforce liquidated damages clauses in otherwise valid contracts if those clauses are unreasonable penalties, despite the fact that the clauses are "agreed to."  *See Crossmark, Inc. v. Hazar*, 124 S.W.3d 422, 435 (Tex. App.—Dallas 2004, pet. denied) ("[I]f the liquidated damages provision contains an unlawful penalty, public policy may forbid enforcement of the agreed-to measure of damages.") (citations omitted); *see also Phillips v. Phillips*, 820 S.W.2d 785 (Tex. 1991) (finding that an agreed damages provision constituted an unenforceable penalty).

Steadfast also contends that whether the amount of the premium-charge provision in the Subcontractors Warranty Endorsement is or is not consistent with actuarial principles is irrelevant because Steadfast did not rely on any actuarial or rate-making principles in setting the amount of the additional charge.  Steadfast moves to strike the expert report and affidavit of SpawMaxwell's actuarial expert, Dr. Mark Crawshaw, on the grounds that Dr. Crawshaw was not timely designated as an expert and his opinions that the charge are unreasonable because they violate actuarial principles are irrelevant.  (Docket Entry No. 46).  Steadfast relies on the same grounds to oppose SpawMaxwell's motion for leave to designate Dr. Crawshaw as an expert witness. (Docket Entry No. 31).  SpawMaxwell recognizes that the court's ruling on its motion for leave to designate Dr. Crawshaw as an expert, (Docket Entry No. 27), is largely determinative of Steadfast's motion to strike his affidavit and report from the summary judgment record.  (Docket Entry No. 43 at 1).

Even without considering Dr. Crawshaw's report and affidavit, this court concludes that the Subcontractors Warranty Endorsement imposes an unenforceable penalty for a subcontractor's failure to obtain insurance from an insurer with a Best rating of "A" or above.  And as explained in detail below, Dr. Crawshaw's report and affidavit are properly considered, which provides additional

22

grounds to hold that the premium-charge provision of the Endorsement is an unenforceable penalty. SpawMaxwell's designation of Dr. Crawshaw was neither so late, so unexcused, nor so prejudicial as to warrant denying SpawMaxwell's motion for leave to use him as an expert witness. And, contrary to Steadfast's arguments, his opinions are relevant to the issues in this suit.

In *Stewart v. Basey*, the Texas Supreme Court stated that if a contract "promises the same reparation for the breach of a trivial or comparatively unimportant stipulation as for the breach of the most important one or of the whole contract, it is obvious that the parties have not adhered to the rule of just compensation." 245 S.W.2d 484, 486 (Tex. 1952) (quoting RESTATEMENT OF CONTRACTS, § 339, cmt.). The *Stewart* court held the liquidated damages provision in the contract at issue unenforceable because it assigned the same penalty for breach of any of the covenants, regardless of the magnitude of the breach or the consequences. Since *Stewart*, courts have continued to hold that contract damages provisions are unenforceable if they provide the same remedy regardless of the magnitude of the breach, because such a provision is not a reasonable estimate of damages. *See Phillips*, 820 S.W.2d at 789–90 (Tex. 1991) (holding that a contractual provision providing that a breaching party pays ten times the actual damages was an invalid penalty provision because the harm was not incapable of estimation and because the provision was not a forecast of actual damages); *Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 727 (Tex. App.—Houston [1st Dist.] 1984, no writ) (finding a fixed damages amount unenforceable because even though the parties agreed that it would constitute damages in the event of breach, the provision was not a reasonable estimate of the amount needed as compensation; all defaults, even a minor one, resulted in the same penalty); *Mayfield v. Hicks*, 575 S.W.2d 571, 575 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.) (finding that a damages clause in an equipment lease constituted an unenforceable penalty because even a minor default by the lessee permitted the lessor to take the

equipment and demand payment of all lease payments and noting that "[a] provision is a penalty if it provides for unreasonable payments for a minor breach.").

"A provision becomes a penalty if it provides for unreasonable damages for trivial breaches as well as reasonable damages for major breaches." *Cmty. Dev. Serv., Inc.*, 679 S.W.2d at 727 (citations omitted).  This is so even if the claim at issue is actually a more major breach.  *See Mayfield*, 575 S.W.2d at 575–76 (finding that even though the appellees had pleaded that the breach was for unpaid rentals, the penalty clause requiring payment of all lease payments for any breach was unenforceable because it would provide a large penalty even for a minor breach).

The premium-charge provision in the Subcontractors Warranty Endorsement does not provide a reasonable estimate of damages resulting from a breach of the Endorsement.  If interpreted as Steadfast advocates, the Endorsement provides the same remedy regardless of what insurance condition is violated.  Interpreted as Steadfast advocates, the Endorsement requires SpawMaxwell to pay an additional premium of $20 for every $1,000 subcontract that violates any of the Endorsement's insurance requirements, whether the subcontractor has failed to obtain any insurance at all or has obtained insurance from an insurer with a rating of "A-".  Steadfast acknowledges that it did not calculate the formula for the amount due for breach of the Subcontractors Warranty Endorsement on any actuarial principles that reflect the risk of harm or the amount of damages that might result.  Instead, the damages provision imposes a flat rate, unrelated to either the magnitude of the breach or of any harm that might result.  As a matter of law, the provision does not reasonably estimate just compensation for breaching the Endorsement.

The premium-charge provision of the Subcontractors Warranty Endorsement also fails the second prong of the penalty analysis.  There is no basis to conclude that the harm caused by subcontractors failing to meet the requirement of obtaining insurance from insurers with Best ratings

24

of at least "A" or "A+" was incapable of estimation when the parties agreed to the Policy renewal. The record shows that the likely harm from SpawMaxwell having subcontractors who carried no insurance or subcontractors who failed to obtain insurance from companies with Best ratings of at least "A" or "A+" could be estimated.  The harm resulting from uninsured and underinsured subcontractors is neither incapable nor very difficult of accurate estimation.

Even without Dr. Crawshaw's report and affidavit, this court finds that the premium-charge provision in the Subcontractors Warranty Endorsement is an unenforceable penalty.  To avoid this result, this court would have to interpret the premium-charge provision to apply only to wholly uninsured subcontractors.  Under either interpretation, Steadfast is not entitled to use the premium-charge provision as the measure of damages for underinsured subcontractors.  This court also finds that it is appropriate to include Dr. Crawshaw's report and affidavit in the summary judgment record, providing further support for the conclusion reached.  The deadline for SpawMaxwell to designate experts was May 21, 2007.  On July 16, 2007, SpawMaxwell moved for leave to designate their counsel as an expert on the issue of attorneys' fees and to designate Dr. Mark Crawshaw as an expert on the issue of reasonableness of rates and premiums charged by Steadfast and other insurers. (Docket Entry No. 27).  SpawMaxwell explained the delay by describing the difficulty of locating an expert on such a technical area of insurance practice and the diligent efforts that led to Dr. Crawshaw.  SpawMaxwell emphasized that it had notified Steadfast of the need for additional time to find a qualified expert and that, if needed, SpawMaxwell would agree to extend the discovery deadline of August 1, 2007 to permit Steadfast to depose Dr. Crawshaw.  (Docket Entry No. 27-2 at 3, 5).  Steadfast opposed the motion for leave to designate Dr. Crawshaw as an expert on the grounds that the failure to do so by the May 21, 2007 deadline amounted to inexcusable neglect; Dr. Crawshaw's testimony based on actuarial rate-making principles is not relevant because the

surcharge in the Subcontractors Warranty Endorsement is not based on actuarial rate-making principles; and allowing the designation will result in undue delay and prejudice Steadfast because it would have to depose Dr. Crawshaw, file motions to strike and to address "frivolous" claims, and might have to locate a rebuttal expert and submit a report.  (Docket Entry No. 31).

A district court has "wide latitude" in pretrial matters to issue orders based on "intelligent flexibility."  *See Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1000 (5th Cir. 1998) (quoting *Davis v. Duplantis*, 448 F.2d 918, 921 (5th Cir. 1971)).  The Fifth Circuit has instructed district courts to "consider four factors in determining whether the testimony of a late-designated expert witness should be permitted: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness."  *Id.* at 1000 (citation omitted); *see also Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998) (citation omitted).

The first factor involves the relative importance of the excluded testimony.  Steadfast argues that the testimony is not important because it relates to actuarial principles that were not used to calculate the rate charged for underinsured subcontractors.

Steadfast's relevance argument regarding Dr. Crawshaw's opinion on what actuarial principles reveal about the reasonableness of the penalty for breaching the Subcontractors Warranty Endorsement is unpersuasive.  The fact that Steadfast did not use any actuarial principles to set the penalty amount does not mean that those principles are irrelevant to determining whether the amount is reasonable or an unenforceable penalty.  To the contrary, the fact that Steadfast ignored actuarial

principles is itself an indication that the amount SpawMaxwell is required to pay is unrelated to "just compensation" for its breach of the Endorsement or to the harm likely to result from its breach.

The Fifth Circuit has taken two separate approaches to the issue of the importance of a late-designated expert. *See Soliz v. Assocs. in Med., P.A.*, No. H-06-2785, 2007 WL 2141392, at *2 (S.D. Tex. July 25, 2007). Under one approach, the more important the witness, the more important the need to designate that witness timely. *Id.* (citing *Geiserman v. MacDonald*, 893 F.2d 787, 791–92 (5th Cir. 1990)). Under the alternative approach, the Fifth Circuit has recognized that the more important the witness to the designating party, the more latitude the district court should give that party to designate beyond the deadline. *See id.* (citing *Betzel v. State Farm Lloyd's*, 480 F.3d 704, 707–08 (5th Cir. 2007)). The importance of the testimony cannot override the other factors considered in determining whether to permit late designation. *Id.* (citing *Betzel*, 480 F.3d at 708).

In the present case, Dr. Crawshaw's opinions are not only relevant and important, but other factors also favor permitting SpawMaxwell to designate him as a witness. The second and third factors involve the degree of prejudice to the opposing party if the witnesses are allowed to testify and the extent to which this prejudice can be ameliorated by a continuance. Steadfast is not unfairly prejudiced by allowing SpawMaxwell to designate Dr. Crawshaw as an expert. Steadfast has already had to spend time and effort engaging Dr. Crawshaw's opinions on the merits, arguing as to their reliability and relevance. Steadfast was offered an opportunity to depose Dr. Crawshaw, and that opportunity has not been foreclosed. This court's determination that Steadfast may not rely on the premium-charge provision in the Subcontractors Warranty Endorsement for SpawMaxwell's alleged breaches of the Subcontractors Warranty Endorsement makes it likely that Steadfast will want to designate its own damages expert. Allowing a brief extension of discovery to permit

27

Steadfast to  to designate its own damages expert and to permit both Steadfast and SpawMaxwell to depose each other's expert on damages will cure potential prejudice to Steadfast from the late designation.  *See Betzel*, 480 F.3d at 708 ("Indeed, 'we have repeatedly emphasized that a continuance is the preferred means of dealing with a party's attempt to designate a witness out of time.'") (quoting *Campbell*, 138 F.3d at 1001).  The ability to reduce potential prejudice by permitting time for discovery and a rebuttal report, the likely importance of the proposed expert opinion, and the fact that the trial setting has already been postponed to allow consideration of the substantial summary-judgment briefing, are strong arguments in favor of allowing SpawMaxwell to designate Dr. Crawshaw as an expert.

The final factor a court is to consider in deciding a motion for late designation is the reason for the delay.  SpawMaxwell asserts that it was difficult to find an expert qualified in the technical area of insurance at issue.  Steadfast responds by arguing that if SpawMaxwell contacted Dr. Crawshaw on the day of the deadline to designate experts, it ought to have designated Dr. Crawshaw on that date, and it should not have waited to file the motion to extend the deadline for almost two more months.  (Docket Entry No. 31 at 2).  Although Steadfast's criticisms are valid, the other three factors weigh heavily in favor of permitting the late designation of Dr. Crawshaw.  The motion for leave to designate Dr. Crawshaw out of time is granted.  *See Betzel*, 480 F.3d at 707 (finding that even though the explanation offered for the delay in designating the expert was weak, the district court abused its discretion by excluding the late-designated witnesses where the remaining factors favored the late designation).[4]

---

[4] SpawMaxwell also sought late designation of its counsel to opine on attorneys' fees. This motion is also granted.  Steadfast is not prejudiced by this late designation.  *See Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 633 (S.D. Tex. 2007) (denying a motion to strike the defendants' experts on attorneys' fees for late designation because "[a]ttorneys' fee claims are generally resolved at the close of the case, after both liability and damages have been

Considering Dr. Crawshaw's report and affidavit as part of the summary judgment strengthens the conclusion that the premium-charge provision of the Subcontractors Warranty Endorsement is an unreasonable amount to recover for SpawMaxwell's failure to ensure that its subcontractors obtained insurance from a company with at least an "A" or "A+" Best rating. Not only does the premium-charge provision in the Endorsement fail to distinguish between a breach consisting of subcontractors with no insurance at all and a breach consisting of subcontractors having insurance that is not from a highly rated insurer, it fails to distinguish between a breach consisting of subcontractors who maintain insurance from a company with a Best rating high in the "secure" range from subcontractors whose insurance is from a company with a Best rating at the low end of the "vulnerable" range. Dr. Crawshaw's report and affidavit provide additional support for the conclusions that the rate of $20 per $1,000 of subcontract cost is not a reasonable forecast of compensation for SpawMaxwell's failure to require its subcontractors to obtain insurance from a company with at least an "A" or "A+" Best rating and that the harm likely to result from this failure was capable of estimation when the Policy was renewed.

Steadfast's motion for summary judgment that the premium-charge provision in the Subcontractors Warranty Endorsement is enforceable is denied. SpawMaxwell's motion for partial summary judgment is granted to the extent it seeks judgment that the premium-charge provision is

---

determined. The defendants' delay in designating the expert testimony on their claim for attorneys' fees and in providing the report did not prejudice Straus."); *Wright v. Blythe-Nelson*, No. 399CV2522D, 2001 WL 804529, at *6 (N.D. Tex. July 10, 2001) (allowing late designation of expert on attorneys' fees because usually attorneys' fees are not decided until after entry of judgment, and "[a]ttorneys who represent parties against whom such fees are sought are not surprised by expert testimony because they can usually expect that opposing counsel will attempt to prove his attorney's fees and because they are themselves experts on the subject. Because the matter is handled by motion and usually decided on affidavits, the court can cure any prejudice that a party may face from a tardy designation by continuing submission of the attorney's fee issue if the party needs additional time to obtain its own expert."). Steadfast has already designated its own counsel on the issue of her fees. SpawMaxwell's motion for leave to designate counsel on the issue of attorneys' fees is granted.

an unenforceable penalty.[5]

## IV.   **What are the Damages for the Breaches of the Subcontractors Warranty Endorsement**?

The parties do not dispute that SpawMaxwell breached the Subcontractors Warranty Endorsement.  Steadfast moved for summary judgment that it is entitled to $518,212.22 in damages for SpawMaxwell's breach of the Subcontractors Warranty Endorsement in failing to require all its subcontractors to obtain insurance from companies with Best ratings of "A" or better.  (Docket Entry No. 36 at 16–17).  Steadfast asserts that the audit it performed shows that SpawMaxwell did nearly $27,000,000 in business with subcontractors who were inadequately insured.  (*Id.* at 16).  Steadfast then applied the premium-charge formula of $20 per $1,000 of subcontract cost as to which the audit revealed inadequate insurance to arrive at the damages figure of $518,212.22, after appropriate credits.  (*Id.* at 17).

SpawMaxwell does not dispute that some of its subcontractors were uninsured.  Nor does SpawMaxwell dispute that the $20 per $1,000 of subcontract cost formula was properly applied to such a breach.  SpawMaxwell asserts that it has paid $41,196 under the formula for uninsured subcontractors.[6]  (*See* Docket Entry No. 42 at 16).  It is also undisputed that some of SpawMaxwell's subcontractors obtained insurance from companies with ratings lower than "A+".  There remain

---

[5]  SpawMaxwell also seeks partial summary judgment that the Subcontractors Warranty Endorsement is unenforceable because it is illegal under the Texas Insurance Code, (*see* Docket Entry No. 37 at 5), and Steadfast also seeks summary judgment that the Endorsement is enforceable because it is not illegal under the Texas Insurance Code, (*see* Docket Entry No. 36 at 9–10).  As a result of the determination on the liquidated damages issue, this court need not reach the issue of enforceability under the Texas Insurance Code.  Likewise, this court need not reach the issue raised by the parties regarding potential invalidity of the premium-charge provision based on SpawMaxwell's alleged lack of notice of the Subcontractors Warranty Endorsement.

[6]  SpawMaxwell asserts that the errors in Steadfast's audit extended to the amount due for subcontractors with no insurance.   SpawMaxwell contends that its own calculations show that it overpaid Steadfast by $6,386.  (Docket Entry No. 42 at 15–16).

30

genuine issues of disputed fact material to determining how often this occurred, what the ratings of the subcontractors' insurers were, and what is the proper measure of damages for those breaches.

Steadfast presented summary judgment evidence of the audit it conducted of SpawMaxwell's subcontractors's insurance.  (*See* Docket Entry No. 36, Ex. C).  SpawMaxwell responded with summary judgment evidence of errors in Steadfast's audit.  (*See* Docket Entry No. 42 at 15–18; Ex. D, Affidavit of Mark Crawshaw; Docket Entry No. 42, Ex. F, Affidavit of Betty Adams).  Steadfast has objected to the affidavits SpawMaxwell submitted as evidence of errors in the audit. Specifically, Steadfast objects to the affidavit of Mark Crawshaw on the basis that his opinion that Steadfast's audit was in error is not supported by facts, the affidavit is conclusory, and the affidavit is insufficiently specific because it asserts that Steadfast's auditor made errors but does not set forth facts showing the errors.  (*See* Docket Entry No. 46 at 20–21).  Steadfast further objects to the pages from Best Insurance Reports, Property/Casualty, United States & Canada, 2006 edition, attached to Dr. Crawshaw's affidavit, as hearsay.  (*Id.* at 21).  Steadfast also objects to the affidavit of Betty Adams, arguing that the opinion that there are errors in Steadfast's audit is insufficiently specific, unclear, and conclusory. (Docket Entry No. 46 at 21–22).

The objections to Dr. Crawshaw's affidavit are overruled.  The conclusions in the affidavit as to why Steadfast's audit is insufficient to establish the level of breach of the Subcontractors Warranty Endorsement are sufficiently specific, and the basis for the conclusions sufficiently identified, to be admissible.  The affidavit is supported in part by pages from Best's Insurance Reports, which, contrary to Steadfast's objections, are not objectionable hearsay.  *See* FED. R. EVID. 803(17) (excepting market reports and commercial publications from the hearsay rule).  Steadfast's

objections to the affidavit of Betty Adams are also overruled. The affidavit is not overly conclusory or general because it attaches the documents that support and explain the conclusion that errors were made in the audit.[7]

Steadfast does not appear to dispute that there may be errors in the audit. Steadfast does argue that SpawMaxwell can only create a factual dispute with respect to the audit by showing that all the subcontractors' insurance companies were rated "A+" or better. (Docket Entry No. 46 at 18–19). Steadfast's argument is based on the assumption that the premium-charge provision of the Subcontractors Warranty Endorsement, which imposes the same damages remedy for any breach of the Endorsement, is valid. This assumption is incorrect. A liquidated damages provision that is held unenforceable as a penalty may not be used as the basis for calculating damages for a breach. *See Loggins Constr. Co. v. Stephen F. Austin State Univ. Bd. of Regents*, 543 S.W.2d 682, 685 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.) ("'The general rule is that if such a provision is for a penalty to secure performance of the contract, it is unenforceable and the party claiming a breach is required to prove his actual damages.'") (quoting *Brace v. Dante*, 466 S.W.2d 66, 69, 70 (Tex. Civ. App.—Dallas 1971, no writ)). As a result, Steadfast is incorrect that SpawMaxwell must show that all the subcontractors' insurance companies were rated "A+" or better in order to raise a factual dispute as to the amount of damages. There are factual disputes material to determining how often

---

[7] Steadfast also objects to portions of the affidavit of Thomas Flaherty as speculative, not based on personal knowledge, hearsay, irrelevant, containing impermissible conclusions, not supported by facts, and using extrinsic evidence to contradict a contractual term. (Docket Entry No. 46 at 22–25). The portions of Flaherty's affidavit to which Steadfast objected were offered to establish that SpawMaxwell had paid $20 per $1,000 in subcontract cost for uninsured subcontractors and to establish that because no claims had been made or paid, Steadfast's actual damages are zero. The first proposition does not appear to be in dispute. The second proposition is irrelevant in light of this court's determination that the damages clause is unenforceable and the fact that actual damages are appropriately based on the risk undertaken when the Policy was renewed and breached, not based on whether the claims were later asserted or paid. Because this court does not rely on Flaherty's affidavit to decide the summary judgment motion, Steadfast's objections are moot.

SpawMaxwell breached the Subcontractors Warranty Endorsement by having subcontractors with insurers whose Best ratings are below "A" or "A+" and whether the breach involved insurers who were highly rated or in the "vulnerable" range.  There are factual disputes material to determining the proper measure and amount of damages for the breach.  The cross-motions for summary judgment as to the nature of the breach and the amount of damages are denied.

## V.     SpawMaxwell's Motion for Leave to File an Amended Pleading

SpawMaxwell filed a motion for leave to file an amended pleading, (Docket Entry No. 24). The proposed third amended answer: (1) adds additional headings; (2) includes a contention that the Subcontractors Warranty Endorsement is not enforceable; (3) adds Marion Collins as plaintiff's agent; (4) states SpawMaxwell's position that the insurance policy was a renewal policy; (5) adds the additional affirmative defenses of ambiguity, illegality, and void as against public policy; and (6) provides more specific citations and amendments to SpawMaxwell's deceptive insurance practice counterclaims.  (*Id.*).  Steadfast opposes the motion for leave to amend the answer on the grounds that the proposed amended answer is untimely and the added affirmative defenses are "frivolous," making the amendment futile.  (Docket Entry No. 28).  Steadfast asserts that the proposed addition of a claim of illegality under the Texas Insurance Code is futile because the asserted Texas Insurance Code sections do not apply to Steadfast as a surplus lines insurer.  (*Id.* at 4–6).  Steadfast further argues that the Texas Insurance Code provision cited as a basis for SpawMaxwell to recover attorneys' fees only applies to a prevailing plaintiff and that the proposed counterclaim lacks the factual foundation necessary to provide notice of the claim.  (*Id.* at 7 (citing TEX. INS. CODE § 541.152(a))).

Steadfast correctly notes that both Rule 15 and Rule 16 govern amending pleadings after a

deadline set forth in a scheduling order.  *See Hawthorne Land Co. v. Occidental Chem. Corp.*, 431 F.3d 221, 227 (5th Cir. 2005) ("Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave.") (internal citations and quotation marks omitted).  In determining whether a party seeking leave to amend has shown good cause, courts should consider the following factors: "(1) the explanation for the failure to move timely for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice."  *Id.* (citing *S & W Enters., L.L.C. v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003)).

The proposed amendments set forth affirmative defenses that the parties have already thoroughly addressed in cross motions for summary judgment.  Although this court's ruling did not require a ruling on all those defenses, the fact that the parties have already made them the basis for summary-judgment motions weighs in favor of allowing the pleadings to conform to the motions that have already been filed.  There is no basis to conclude that the amendments are sought in bad faith or with dilatory motive and there is no prejudice to Steadfast, which has had a full opportunity to address the amendments on the merits.  The motion for leave to file an amended pleading is granted.

## VI.   Conclusion

Steadfast's motion for summary judgment is denied.  SpawMaxwell's motion for partial summary judgment is granted with respect to the unenforceability of the premium-charge provision in the Subcontractors Warranty Endorsement and denied with respect to dismissing Steadfast's breach of contract claims.  SpawMaxwell's motions for leave to file an amended pleading and to

designate experts are granted.  Steadfast's motion to strike the expert report and affidavit of Mark

Crawshaw is denied.  A scheduling conference will be held on **January 16, 2008, at 5:00 p.m.** in

Courtroom 11-B.

SIGNED on January 3, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

35