# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| STEADFAST INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-2736 |
| | § | |
| SMX 98, INC. and SPAWMAXWELL | § | |
| COMPANY, L.P., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

This case involves a contract dispute between a surplus-lines insurer, Steadfast Insurance Company, and its insureds, SMX 98, Inc. and SpawMaxwell Company, L.P. (together, "SpawMaxwell").   The dispute arises from an endorsement requiring SpawMaxwell, a construction company, to have its subcontractors obtain commercial general liability insurance policies that met certain conditions.   The endorsement required the subcontractors' policies to have certain coverages and limits, name SpawMaxwell as an additional insured, and be issued by insurance companies with an "'A+' Best rating or better."   The endorsement stated that a failure to comply would not change SpawMaxwell's coverage but would result in the subcontractors being considered "to be [the insured's] employees for the purpose of computing rate and premium and such premium will be charge[d] at a rate of: $20 per $1,000 of uninsured/uninsured sub cost."   Steadfast sued for breach of contract, claiming that an audit of the subcontractors' insurance revealed that some

did not meet all the endorsement's conditions.   Steadfast seeks $518,212.22 under the endorsement.

In ruling on cross-motions for summary judgment, this court concluded that the endorsement's damages provision was an unenforceable penalty.  (Docket Entry No. 54). Steadfast then filed an amended complaint, (Docket Entry No. 63), and SpawMaxwell filed an amended answer, (Docket Entry No. 68).  SpawMaxwell asserts that under the Texas Insurance Code, the warranty endorsement and the insurance contract are unenforceable. The parties have now filed additional cross-motions for summary judgment.  The following motions are pending:

- SpawMaxwell has moved for partial summary judgment that the insurance contract is unenforceable under the Texas Insurance Code, (Docket Entry No. 81).  Steadfast responded, (Docket Entry No. 83), and SpawMaxwell replied, (Docket Entry No. 86).  Steadfast has cross-moved for summary judgment that the contract is enforceable under the Texas Insurance Code, (Docket Entry No. 84), and filed a supplement to its cross-motion, (Docket Entry No. 87).

- Steadfast has moved for partial summary judgment on SpawMaxwell's affirmative defenses that the insurance contract is illegal under the Texas Insurance Code, (Docket Entry No. 69).  SpawMaxwell responded, (Docket Entry No. 77), and Steadfast replied, (Docket Entry No. 78).

- Steadfast has moved for partial summary judgment on SpawMaxwell's affirmative defense of accord and satisfaction and on Spawmaxwell's

2

counterclaims for breach of contract and deceptive insurance practices, (Docket Entry No. 85). SpawMaxwell responded, (Docket Entry No. 88), Steadfast replied, (Docket Entry No. 89), SpawMaxwell filed a surreponse, (Docket Entry No. 91), and Steadfast responded to the surresponse, (Docket Entry No. 94).

- Steadfast has moved to strike the affidavit of SpawMaxwell's expert, Dr. Mark Crawshaw, (Docket Entry No. 94), to exclude Dr. Crawshaw's testimony, (Docket Entry No. 98), and for a pre-trial *Daubert* hearing, (Docket Entry No. 99). SpawMaxwell has not responded to these motions.

Based on a careful review of the motions, responses, and replies, the record, and the applicable law, this court:

- denies SpawMaxwell's motion for partial summary judgment that the insurance contract is unenforceable under § 101.201 of the Texas Insurance Code and grants Steadfast's cross-motion for summary judgment that § 101.201 does not preclude Steadfast from seeking to enforce the contract;

- grants Steadfast's motion for partial summary judgment on SpawMaxwell's affirmative defense that the insurance contract is illegal under the Texas Insurance Code;

- grants Steadfast's motion for partial summary judgment on SpawMaxwell's affirmative defense of accord and satisfaction and SpawMaxwell's counterclaims for breach of contract and deceptive insurance practices; and

3

- denies Steadfast's motions to strike Dr. Crawshaw's first report, to exclude his testimony, and for a pre-trial *Daubert* hearing.

The reasons for these rulings are set out below.

## I.     Factual Background

The relevant background is detailed in this court's previous memorandum and opinion.  Briefly, Steadfast is a surplus lines insurer.  (Docket Entry No. 36, Ex. A at 1). Surplus lines insurance allows a party unable to obtain coverage for a Texas risk from a licensed Texas insurer to obtain coverage from an insurer not licensed in Texas but who is an "eligible" surplus lines insurer.  SpawMaxwell sought to renew its Steadfast policy for the 2002–2003 year by submitting applications through an insurance agent, Insurance Associates of the Southwest ("IAS"), to a broker, Heath Insurance Brokers, Inc. ("Heath").  (*Id.* at 2, Ex. A at SFI 000202–216).  Heath received a quote from Steadfast that identified "Notable Endorsements" in a section entitled "Amendments to Coverage."  The "Notable Endorsements" included "Subcontractor's warranty ($1/1 limits w/ A+ carrier to be met or surcharge of $20 rate x uninsured/underinsured sub costs)."  (*Id.*, Ex. A at SFI 000224).  On May 28, 2002, Heath sent the Steadfast renewal quote to IAS, SpawMaxwell's agent, and IAS accepted the quote.  (*Id.*, Ex. A. at SFI 000236).

On May 29, 2002, Heath issued a binder for the insurance coverage.  (Docket Entry No. 36, Ex. A at SFI 000226–228).  Like the quote, the binder contained an "Amendments to Coverage" section, which included a reference to the subcontractors' warranty endorsement.  (*Id.*, Ex. A. at SFI 000227).  Heath sent the binder to IAS the same day.  (*Id.*,

4

Ex. A at SFI 000230–235).  On June 14, 2002, Heath sent the permanent insurance policy

to IAS.  (*Id.*, Ex. A. at SFI 000229).  The cover letter enclosing the policy asked that IAS

review the policy and advise Heath immediately if there were any corrections, omissions, or

changes.  (*Id.*).

Steadfast issued SpawMaxwell commercial general policy number SCO 5215529-01

(the "Policy") with effective dates of May 29, 2002 through May 29, 2003.  (Docket Entry

No. 36, Ex. B).   The Policy included Endorsement Number 10, the Subcontractors

Maintenance of Liability Limits Endorsement ("Subcontractors Warranty Endorsement").

(*Id.*, Ex. B at SFI 000067–68).  The Subcontractors Warranty Endorsement stated that

SpawMaxwell would require all subcontractors shown on the "Schedule of Designated

Subcontractors" to:

> (a) Maintain Commercial General Liability insurance coverage
> provided by: an insurance company with "A+" Best rating or
> better;
>
> (b) Provide minimum limits as respects Coverage A.  Bodily
> injury or Property damage of $1,000,000 for Each Occurrence.
> $1,000,000 General Aggregate, $1,000,000 Products Completed
> Operations Aggregate;
>
> (c) Have you [SpawMaxwell] added to their policies as an
> Additional Insured in accordance with a. and b. above;
>
> (d) Provide you with Certificates of Insurance showing the
> coverage requirements indicated in a., b., and c. above.

(*Id.*, Ex. B at SFI 000067).  The Subcontractors Warranty Endorsement stated that failure to

comply with these conditions would not alter the coverage the Policy provided.  Failure to

comply, however, would result in Steadfast considering the noncompliant independent subcontractors to be SpawMaxwell's employees for the purpose of computing "rate and premium and such premium will be charge [sic] at a rate of $20 per $1,000 of uninsured/uninsured sub cost," (the "premium-charge provision").  (*Id.*, Ex. B at SFI 000068).   The Endorsement also stated that the subcontractors' insurance naming SpawMaxwell as an additional insured would be considered primary insurance, with the Steadfast Policy excess to the limits of the subcontractor insurance limits.  (*Id.*).

After the Policy period ended, Steadfast audited the subcontractors' insurance. Steadfast concluded that SpawMaxwell had failed to comply with the Subcontractors Warranty Endorsement by having subcontractors with either no insurance or with insurance issued by carriers with Best ratings lower than "A."  (Docket Entry No. 36, Ex. C). SpawMaxwell paid Steadfast $41,196 for those subcontractors with no insurance at all. SpawMaxwell paid this amount based on an invoice from Steadfast that calculated the premium for contracts with no insurance using the Endorsement premium-charge formula of $20 per $1,000 of "subcost."  (*See id.* at 5, Ex. D at 3; Docket Entry No. 37 at 2).  In a letter dated October 25, 2004, Steadfast demanded an additional $518,212.22 for those subcontracts in which the subcontractors had insurance but the insurers were rated below "A" or "A+".[1]  (Docket Entry No. 36, Ex. B at SFI 000028).  SpawMaxwell refused to pay and

---

[1]   It is unclear whether Steadfast seeks to recover the premium amount for those subcontractors insured by companies rated below "A+" or only those insured by companies rated below "A."  Although the Subcontractors Warranty Endorsement requires that the subcontractors be insured by companies rated "A+" or better and Steadfast's amended complaint refers to this requirement, Steadfast's audit appears to note as inadequately insured only those subcontractors

Steadfast sued.

Steadfast moved for summary judgment on its claims that the Subcontractors Warranty Endorsement is enforceable, that SpawMaxwell breached the contract, and that SpawMaxwell owes $518,212.22 in surcharge. SpawMaxwell cross-moved for partial summary judgment that the endorsement only applies to "uninsured" subcontractors with no insurance, rather than "underinsured" subcontractors that have insurance with companies with Best ratings below "A+". SpawMaxwell also sought summary judgment on its defense that if the damages provision in the endorsement applied to breaches based on both uninsured and underinsured subcontractors, it is a liquidated damages clause that is an unenforceable penalty. On January 3, 2008, this court denied Steadfast's motion for summary judgment and granted SpawMaxwell's motion for partial summary judgment in part, "finding that if the damages provision of the endorsement is interpreted to cover both uninsured subcontractors and subcontractors who have insurance issued by companies that have Best ratings of below "A+", as Steadfast argues, it is an unenforceable liquidated damages provision." (Docket Entry No. 54). But this court denied SpawMaxwell's motion "to the extent it [sought] a dismissal of Steadfast's breach of contract claims." (*Id.*). The parties' current cross-motions on the enforceability of the contract and the warranty endorsement followed.

---

insured by companies rated "A-" or below. Steadfast's previous summary judgment motion appeared to seek recovery only for those subcontracts insured by companies rated "A-" or below. (*See* Docket Entry No. 36 at 16). Steadfast noted that its summary judgment motion should not be read to constitute a waiver of its right to seek additional amounts from a jury and that Steadfast may evaluate additional charges based on those subcontractors insured by companies with an "A" rating. (*Id.* at 17 n.2).

## II.     The Legal Standards

### A.     Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot

survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## B.    Contract Interpretation

The interpretation of insurance polices is governed by the same rules that govern construction of other written contracts. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) (citation omitted). A court's primary concern in construing a contract is to determine the parties' intent. *Harrison v. Great Am. Assurance Co.*, 227 S.W.3d 890, 893 (Tex. App.—Dallas 2007, no pet.). Terms in an insurance contract will be given their ordinary meaning unless the policy shows that the words were meant in a different sense. *§. Mutual Cas. Co. v. Johnson*, 584 S.W.2d 703, 704 (Tex. 1979). Whether an insurance

contract provision is enforceable is a question of law. *Valley Reg'l Med. Ctr. v. Wright*, 276 F. Supp. 2d 620, 633 (S.D. Tex. 2001) (citing *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 678 (Tex. App.—Houston [1st Dist.] 1996, no writ)).

## III.    The Summary Judgment Motions

The parties have filed a number of summary judgment motions, responses, and replies. The filings raise four sets of issues. The first is whether Steadfast is authorized to enforce the insurance contract in Texas. The second is whether the Subcontractors Warranty Endorsement is illegal under the Texas Insurance Code. The third is whether Steadfast is entitled to judgment as a matter of law on SpawMaxwell's affirmative defense of accord and satisfaction and on its counterclaim for breach of contract. The last is whether Steadfast is entitled to judgment as a matter of law on SpawMaxwell's counterclaim for deceptive insurance practices. Each set of issues is examined below.

### A.    The Enforceability of the Insurance Contract

Under § 101.201(a) of the Texas Insurance Code, an insurance contract effective in Texas and "entered into by an unauthorized insurer is unenforceable by the insurer." The term "unauthorized insurer" includes a surplus lines insurer not licensed in Texas. *See Mid-American Indemnity Ins. Co. v. King*, 22 S.W.3d 321, 326 (Tex. 1995). Section 101.201(a), however, does not apply to "insurance procured by a licensed surplus lines agent from an eligible surplus lines insurer . . . on which premium tax is paid." *Id.*, § 101.201(b). SpawMaxwell has moved for summary judgment on its claim that the Steadfast insurance contract is unenforceable under § 101.201(b) because Steadfast is an unauthorized insurer

10

and does not meet the exception for surplus lines insurers.  Steadfast has cross-moved for summary judgment on its assertion that § 101.201 does not preclude it from enforcing the insurance contract because it is an eligible surplus lines insurer.

Steadfast submitted affidavits showing that the SpawMaxwell insurance contract was procured by a licensed surplus lines agent, Hardy Nix, and that Steadfast is an eligible surplus lines insurer.  (Docket Entry No. 36, Ex. A; Docket Entry No. 83, Ex. B).  Steadfast asserts that these uncontroverted affidavits prove that it is an eligible surplus lines insurer and that it used a licensed surplus lines agent.  (Docket Entry No. 83, at 2-3).  SpawMaxwell "concedes that Steadfast has submitted some evidence that the insurance contract at issue was procured by a licensed surplus lines agent from an eligible surplus lines insurer."  (Docket Entry No. 86, at 2).  SpawMaxwell argues that, notwithstanding this evidence, Steadfast does not meet the exception to § 101.201 because it has not paid premium taxes on premiums charged after July 15, 2002.  SpawMaxwell points to invoices and records showing that it paid $117,771.00 in premiums to Steadfast in 2004.[2]  (Docket Entry No. 86, Exs. B, C).  Steadfast asserts that its licensed surplus lines agent paid taxes on the premium payments received from SpawMaxwell for the Policy.  (Docket Entry No. 87, Ex. A).  Steadfast submitted an affidavit with an attachment showing that the agent paid premium taxes on July 16, 2002, October 11, 2004, and May 26, 2005 for premiums of $177,750.00, $347.00, and $117,771.00, respectively.  (*Id.*).  These tax payments – $8,620.88, $16.83, and $5,711.89

_____

[2] SpawMaxwell's check was made out for $123,777.32, but the record makes clear that the premium amount paid was $117,771.00 and the remainder of the $123,777.32 was for "taxes & stamping fee."  (Docket Entry No. 86, Ex. C).

– were for SpawMaxwell's premiums paid for the Policy effective May 29, 2002 to May 29, 2003.  (*Id.*).

Based on the undisputed summary judgment evidence, this court concludes that the insurance at issue was "procured by a licensed surplus lines agent from an eligible surplus lines insurer" and that Steadfast paid the premium taxes on the premiums SpawMaxwell paid. *See Prodigy Communications Corp. v. Agricultural Excess & Surplus Ins. Co.*, 195 S.W.3d 764, 768 (Tex. App.—Dallas 2006, pet. granted) (affirming summary judgment that surplus lines insurer could enforce an insurance contract because the insurer presented uncontroverted evidence that the insurance was procured by a licensed surplus lines agent and that the insurer met the statutory requirements for eligibility).  As a matter of law, Texas Insurance Code § 101.201 does not preclude Steadfast from enforcing the insurance contract.

SpawMaxwell also argues that Steadfast does not meet the exception to § 101.201 because it has not paid premium taxes for the amounts it seeks to recover in this lawsuit. SpawMaxwell argues that Steadfast cannot characterize the amounts it seeks as a "surcharge" because the second amended complaint alleges that Steadfast seeks "additional premium" in this lawsuit.  SpawMaxwell points to the Texas Insurance Code, which states that the "premiums *charged* for surplus lines insurance are subject to a premium receipts tax of 4.85 percent of gross premiums *charged*."  TEX. INS. CODE art. 1.14-2 § 12(a) (emphasis added by SpawMaxwell).  SpawMaxwell argues that this language means that Steadfast was required to pay the premium taxes for the premiums charged, including the amounts it seeks that SpawMaxwell did not pay, and not only for the premiums that Steadfast collected or

received from SpawMaxwell.

Steadfast responds that the amounts it seeks in this case are contractual damages, not premiums. Steadfast points to the Texas Insurance Code definition of "premium," which includes "all premiums, membership fees, assessments, dues or any other consideration for insurance." TEX. INS. CODE art. 1.14-2 § 12(a). Steadfast also points to the Texas Department of Insurance definition of "premium" as "[t]he amount paid by an insured to an insurance company to obtain or maintain an insurance policy." (Docket Entry No. 87, Ex. B, Texas Dept. of Ins. Glossary of Common Insurance Terms, http://www.tdi.state.tx.us/consumer/glossary.html). Steadfast argues that the damages for breach of the Subcontractors Warranty Endorsement are not "consideration for insurance" because "the amounts, duration, or scope of insurance provided by Steadfast to SpawMaxwell is not affected in any way by SpawMaxwell's non-compliance or compliance with the subcontractors warranty endorsement." (Docket Entry No. 87, at 4). Steadfast contends that the damages it seeks are not amounts SpawMaxwell will pay to obtain or maintain a policy because "SpawMaxwell paid for its policy and is entitled to all the benefits of the policy pursuant to its terms and conditions." (*Id.*, at 5). Steadfast argues that even assuming the amounts it seeks are premiums, it is not required to pay taxes on those premiums until they are received. Steadfast cites *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83 (Tex. 2006), for the proposition that "on surplus lines policies, the surplus lines agent must pay the tax *after collecting it from the insureds*." *Id.* at 89 (emphasis added by Steadfast). Steadfast also cites § 1.14-2 § 12(a) of the Texas Insurance Code, which states

that "premiums charged for surplus lines insurance are *subject to* a premium receipts tax,"

(emphasis added by Steadfast), and argues that although premiums taxes are assessed when

charged, there is no obligation to pay the premium receipts tax until the premiums are

collected from the insured.

The exception to § 101.201(a) for surplus lines insurers applies to insurance "on

which premium tax is paid in accordance with Chapter 225." TEX. INS. CODE § 101.201(b).

Under Chapter 225, the "[t]axable gross premiums under this section are based on gross

premiums written or received for surplus lines insurance placed through an eligible surplus

lines insurer during a calendar year." *Id.*, § 225.004(b).  "The surplus lines agent shall

collect from the insured the tax imposed by this chapter at the time of delivery of the cover

note, certificate of insurance, policy, or other initial confirmation of insurance and the full

amount of the gross premium charged by the eligible surplus lines insurer for the insurance."

*Id.*, § 225.006.  The surplus lines agent "holds taxes collected under this chapter in trust."

*Id.*, § 225.007.  The premium tax collected by the agent "is due and payable on or before

March 1. . . . [The] surplus lines agent shall pay the tax imposed by this chapter and file the

report using forms prescribed by the comptroller." *Id.*, § 225.008.  The agent is only required

to prepay the tax if the "amount of the accrued taxes due is equal to at least $70,000." *Id.*,

§ 225.009.

Regardless of the label used by the parties – "premium," "surcharge," or "damages"

– the amount Steadfast seeks in this lawsuit for breach of the Subcontractors Warranty

Endorsement is not consideration for insurance coverage.  SpawMaxwell paid premiums for

14

the coverage it received under the Steadfast Policy. The Subcontractors Warranty Endorsement in the Policy stated that SpawMaxwell's "failure to comply with the conditions above will not alter the coverage provided by this policy." (Docket Entry No. 36, Ex. B). The amounts that Steadfast seeks in this lawsuit for SpawMaxwell's alleged breach of the Subcontractors Warranty Endorsement are not payments to "obtain or maintain" the Policy. Steadfast's agent collected the premium tax from SpawMaxwell when premiums for insurance coverage were paid. The agent did not have an obligation to collect, and did not collect, the amounts that Steadfast seeks in this lawsuit.

Because Steadfast meets the requirements for an "eligible" surplus lines insurer, the insurance contract is not unenforceable under § 101.201 of the Texas Insurance Code. SpawMaxwell's motion for partial summary judgment that the insurance contract is unenforceable is denied and Steadfast's cross-motion for summary judgment that § 101.201 does not preclude it from enforcing the insurance contract is granted.

### B.      The Enforceability of the Subcontractors Warranty Endorsement

SpawMaxwell previously moved for summary judgment that the Subcontractors Warranty Endorsement is unenforceable because the premium charges are illegal under the Texas Insurance Code, (*see* Docket Entry No. 37, at 5), and Steadfast moved for summary judgment that the endorsement is enforceable because it is not illegal under the Texas Insurance Code, (*see* Docket Entry No. 36, at 9-10). In the January 3, 2008 Memorandum and Opinion, this court found it unnecessary to rule on this issue. (Docket Entry No. 54).

After this court issued its opinion, SpawMaxwell filed an amended answer, asserting

as an affirmative defense that the "premiums Steadfast charged and, defendants anticipate, the premiums Steadfast will attempt to charge, are illegal" under Texas Insurance Code Article 5.13-2 § 4 (re-codified at TEX. INS. CODE § 2251.052) and Texas Insurance Code Article 1.14-2 § 9. (Docket Entry No. 68). SpawMaxwell also alleged that the "premiums and rates" Steadfast charged and will attempt to charge are illegal and unenforceable because they are not in the Policy, as required by Texas Insurance Code Article 1.14-2 § 7(b). (*Id.*). Steadfast now seeks summary judgment that the Subcontractors Warranty Endorsement is enforceable because it is not illegal under the Texas Insurance Code. (Docket Entry No. 69).

SpawMaxwell argues that the insurance contract is illegal because it seeks premiums that are excessive, unreasonable, and unfairly discriminatory under Article 1.14-2 § 9 (now TEX. INS. CODE § 981.005), which SpawMaxwell asserts incorporates Article 5.13-2 § 4 (now TEX. INS. CODE § 2251.052).[3] (Docket Entry No. 77 at 4). Article 5.13.-2 § 4 (repealed April 1, 2007) and the new § 2251.052 prohibit rates that are excessive, inadequate, unreasonable, or unfairly discriminatory for the risks to which the rate applies. TEX. INS. CODE art. 5.13-2 § 4(d); TEX. INS. CODE § 2251.052(b).

SpawMaxwell argues that Article 1.14-2 § 9 "'treats surplus lines contracts like other types of insurance contracts.'" (Docket Entry No. 77 at 4 (quoting *Coleridge v. Parker*, 1994 WL 907407, at *5 (S.D. Tex. 1994)). SpawMaxwell notes that under Article 1.14-2 § 9, "[i]nsurance contracts procured from an eligible surplus lines insurer . . . shall be given

---

[3] SpawMaxwell's briefing on this issue cites to sections of the Texas Insurance Code that have been repealed and/or superceded. Art. 1.14-2 was not repealed until April 1, 2005 and was thus still in effect during the term of the insurance contract at issue.

recognition in all matters and in all respects to the same effect and extent as like contracts issued by licensed insurers . . . .'" (*Id.* (quoting TEX. INS. CODE art. 1.14-2 § 9)).  According to SpawMaxwell, Article 1.14-2 § 9 makes Article 5.13-2 § 4 applicable to surplus lines insurers.  (*Id.*).  Steadfast responds that courts in the Southern District of Texas have found Article 5.13-2 to be inapplicable to surplus lines carriers.  (Docket Entry No. 69 at 6 (citing *Coleridge*, 1994 WL 907407, at *7 n.4)).

Article 1.14-2 § 9 does not make the regulations in Article 5.13-2 § 4 apply to surplus lines carriers.  Article 1.14-2 § 9 provides:

> (a) Insurance contracts procured as surplus line coverage from unauthorized insurers in accordance with this Article shall be fully valid and enforceable as to all parties, and shall be given recognition in all matters and respects to the same effect and extent as like contracts issued by authorized insurers.
>
> (b) A contract of insurance placed in effect by an unauthorized insurer in violation of this Article is unenforceable by the insurer.  The insured shall not be precluded from enforcing his rights in accordance with the terms and provisions of such contract.

TEX. INS. CODE art. 1.14-2 § 9.  This section appears to recognize and make enforceable surplus lines insurance to the same extent as insurance by an authorized insurer, provided that the requirements governing surplus lines insurers are met.  This section does not generally incorporate standards from other chapters of the Insurance Code and make those standards applicable to surplus lines insurance.  Stating that surplus lines insurance contracts should be recognized to the same extent as licensed insurance contracts does not mean that surplus

lines contracts are subject to all the same regulations as contracts procured by licensed insurers.

The conclusion that Article 5.13-2 § 4 does not apply to surplus lines insurers is supported by Article 5.13-2 § 2. That statute defines the scope of Article 5, which applies to insurers "authorized to engage in the business of insurance in this state," within specified lines of insurance. TEX. INS. CODE art. 5.13-2 § 2 (repealed April 1, 2007). Surplus lines insurance is not listed within the categories of insurance covered by Article 5. SpawMaxwell's reading of Article 1.14-2 § 9 is at odds with the specified applicability of Article 5.13-2 § 4.

SpawMaxwell points to Article 1.14-2 § 17A of the Texas Insurance Code, which states that "'[i]f a[n] eligible surplus lines insurer violates Section 9 of this article **or a rule, regulation, or order adopted under that provision**, the State Board of Insurance may assess a penalty against that insurer . . . .'" (Docket Entry No. 77 at 5 (quoting TEX. INS. CODE art. 1.14-2 § 17A (repealed April 1, 2005)) (emphasis added by SpawMaxwell). SpawMaxwell acknowledges that § 17A applies to penalties or sanctions, but asserts that the section "makes clear that TEX. INS. CODE art. 1.14-2, § 9 adopted certain contractually related requirements that surplus lines contracts be treated like licensed insurer contracts and, if a contractual term is illegal under a licensed insurer contract, it is illegal under a surplus lines contract." (*Id.*). Section 17A does not go as far as SpawMaxwell asserts. Section 17A states that certain sanctions apply to violations of specific sections of the Code. *See* TEX. INS. CODE art. 1.14-2 § 17A ("If a surplus lines agent or eligible surplus lines insurer violates

18

Section 8 or 9 of this article or a rule, regulation, or order adopted under that provision, the State Board of Insurance may assess a penalty against that agent or insurer as provided by Section 7, Article 1.10, of this code."). Section 17A is not a basis for concluding that surplus lines contracts are subject to all of the same restrictions as contracts procured by licensed insurers. Rather, in § 17A, the Texas legislature identified specific ways in which surplus lines carriers would be subject to the same restrictions as licensed insurers. Otherwise, a surplus lines insurance contract is enforceable. *See* TEX. INS. CODE art. 1.14-2 § 9(a) (stating that a surplus lines insurance contract is valid and enforceable provided that it does not violate the article governing surplus lines insurance).

This court concludes that neither Article 5.13-2 § 4 nor § 2251.052 of the Texas Insurance Code apply to surplus lines insurers.[4] This result does not mean that if a surplus lines insurer such as Steadfast charges excessive, unreasonable, or unfairly discriminatory rates, such rates could not be found illegal or unenforceable under other applicable statutes or case law. For example, SpawMaxwell points to Article 1.02(b) of the Texas Insurance Code, which, when read together with Article 1.02(a), requires a surplus lines insurer's rates to be "just, fair, reasonable, adequate, not confiscatory, and not excessive for the risk for

---

[4] This result is based on the statute, not based on Steadfast's citation to *Coleridge*. The court in *Coleridge* held that "Section 2 of Article 5.13-2 makes clear that policies issued by surplus lines insurers are not 'subject to this Article' and need not be approved by the Commissioner of Insurance." 1994 WL 907407, at *7 n.4. However, the *Coleridge* court was analyzing whether surplus lines insurers had to comply with a specific requirement to get approval from the Commissioner of Insurance. It is not clear that the *Coleridge* court would have come to the same conclusion if the issue had been determining whether a surplus lines insurer is authorized to charge unreasonable rates. This court's conclusion that surplus lines insurers are not subject to Article 5.13-2 § 4 is based on the statute and not on the *Coleridge* court's resolution of a different issue.

19

which they apply, and not unfairly discriminatory." TEX. INS. CODE art 1.02(b).  However, Article 1.02(b) did not come into effect until June 11, 2003 and does not apply to this insurance contract, which has an effective date of May 29, 2002.  As a result, the surplus lines insurance contract at issue here is not subject to Article 1.02(b) or Article 5.13-2 § 4 of the Texas Insurance Code and the damages provision in the Subcontractors Warranty Endorsement is not "illegal" under those Code sections.

Steadfast has also argued that the amounts it seeks are a surcharge, to which the Texas Insurance Code does not apply.  Steadfast contends that "nothing forbids a surcharge from being charged by an insurer."  (Docket Entry No. 36 at 10).  Steadfast notes that the Texas Department of Insurance defines a "surcharge" as: "(a)n extra charge added to your premium by an insurance company."  (*Id.* (citing Texas Dept. of Ins. - Glossary of Common Insurance Terms,  at  http://www.tdi.state.tx.us/consumer/glossary.html)).   Steadfast argues that a "surcharge" is not a "rate," which is defined as "the cost of insurance per exposure unit, whether expressed as a single number or as a prospective loss cost, with an adjustment to account for the treatment of expenses, profit, and individual insurer variation in loss experience, before any application of individual risk variations based on loss or expense considerations."[5] (*Id.*).  Steadfast asserts that SpawMaxwell cannot cite to a provision in the Texas Insurance Code that restricts, forbids, or precludes an insurer from charging a surcharge.  (*Id.*).  SpawMaxwell responds that the term "premium" is broadly defined in Article 1.14-2 § 12(a).  (Docket Entry No. 77 at 5–6).  SpawMaxwell does not explain,

---

[5] TEX. INS. CODE art. 5.13-2 § 3(a)(6).

however, why the definition of the term "premium" in another article in the Insurance Code is instructive as to whether a "surcharge" is covered by the "rate" restrictions in Article 5.13-2, particularly when Article 5.13-2 specifically defines "rate."

To the extent a "surcharge" falls within the definition of "rate" within Article 5.13-2, it would be subject to the restrictions on rates in that article, regardless of whether the charge is called a "surcharge" rather than a rate.  Steadfast's argument that the Insurance Code does not restrict the right to charge a surcharge is irrelevant because the issue is whether the "surcharge" is subject to the reasonableness requirements, not whether the insurer is permitted to charge a surcharge at all.  However, it is not necessary to decide whether the charge at issue in this case is a "rate" under Article 5.13-2 because, as explained above, Article 5.13-2 is inapplicable.  The charge in the Subcontractors Warranty Endorsement is not "illegal" under Article 5.13-2 of the Texas Insurance Code.  The Policy is not "illegal" under Texas Insurance Code art. 1.14-2 § 7(b) because the rate and premium to be charged are contained in the written Policy and the amounts that Steadfast seeks in this lawsuit for breach of the Subcontractors Warranty Endorsement are not a "premium."  The Policy contained the $1.69 per $1,000 premium-rate charge and the insurance contract is not rendered unenforceable by Article 1.14-2 § 7(b).

Steadfast's motion for summary judgment on SpawMaxwell's affirmative defense that the insurance contract is unenforceable because it is illegal is granted.

### C.    SpawMaxwell's Accord & Satisfaction Defense and Breach of Contract Counterclaim

SpawMaxwell alleged that it is "not liable to plaintiff because there was an accord and satisfaction." (Docket Entry No. 68, at 5). In March 2004, Steadfast demanded $616,551.00 as a result of the audit of SpawMaxwell's subcontractors' insurance. SpawMaxwell disputed the audit results and challenged Steadfast's interpretation of the term "uninsured subcost." SpawMaxwell identified the amount owed as $117,771.00. According to SpawMaxwell, Steadfast responded by having its licensed surplus lines agent send a revised invoice for $117,771.00 in "roughly June or July 2004." (*Id.*). SpawMaxwell argues that it "paid the revised invoice in full in or about July 2004." (*Id.*). SpawMaxwell has counterclaimed for breach of contract, alleging that Steadfast breached the accord and satisfaction by bringing this suit to recover for the amount set out in the original demand. SpawMaxwell seeks its attorneys' fees. (*Id.*, at 5-6).

An accord and satisfaction occurs when parties agree to discharge an existing obligation in a manner other than as originally agreed. *See Case Funding Network*, *L.P. v. Anglo-Dutch Petroleum*, 264 S.W.3d 38, 50 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The "accord" is the new agreement and the "satisfaction" is the discharge of the obligation. *Metromarketing Serv.*, *Inc. v. HTT Headwear*, *Ltd.*, 15 S.W.3d 190, 197 (Tex.App.—Houston [14th Dist.] 2000, no pet.). To establish this affirmative defense, a party must show "'an assent of the parties to an agreement that the amount paid by the debtor to the creditor was in full satisfaction of the entire claim.'" *Case Funding Network*, 264 S.W.3d at 50 (quoting *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969)). "There must be an unmistakable communication to the creditor that tender of the lesser sum

is upon the condition that acceptance will constitute satisfaction of the underlying obligation." *Id.* (citations omitted). "The condition must be plain, definite, and certain and 'the statement accompanying the tender of a sum less than the contract price must be so clear, full, and explicit that it is not susceptible of any other interpretation.'" *Id.* (quoting *Jenkins*, 449 S.W.2d at 455). An explicit statement that the new contract supersedes the original contract is not necessary. *Baylor Health Care Sys. v. Employers Reinsurance*, 492 F.3d 318, 321 (5th Cir. 2007) (citing *Womco*, *Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 280 (Tex.App.—Tyler 2002, no pet.)). "[C]ourts may look to the circumstances surrounding the execution of the new agreement to determine if there has been an agreement to discharge the original obligation." *Id.* "When the parties' intent is 'resting in implication,' however, the circumstantial evidence must 'irresistibly point to the conclusion' that, in reaching a new agreement, the parties assented to a complete discharge of the original obligation." *Baylor Health Care Sys.*, 492 F.3d at 321.

The record includes two relevant invoices. The first, dated March 23, 2004, was sent to SpawMaxwell by its insurance agent, GSM Insurers. (Docket Entry No. 85, Ex. C). This invoice stated that SpawMaxwell owed Steadfast $117,771.00 for "Undisputed Part of Final Audit" and $6,006.32 for "State Tax & Fee" for a total amount of $123,777.32. (*Id.*). SpawMaxwell's corporate representative acknowledged in her deposition that the payment made under that invoice was only for the undisputed portion of the amount at issue. (Docket Entry No. 85, Ex. D, Deposition of Betty Adams, at 175:3–6). SpawMaxwell paid GSM the

total amount called for in this invoice in March 2004.  (Docket Entry No. 86, Ex. C; Docket Entry No. 88, Ex. A, Affidavit of Tom Flaherty, Ex. C).

The second invoice was dated June 28, 2004 and sent to SpawMaxwell by Heath Insurance Brokers, Steadfast's surplus lines agent.  (Docket Entry No. 85, Ex. A).  The invoice stated that SpawMaxwell owed Steadfast $112,000.22, calculated as $117,771.00 in premium plus a stamping fee and surplus lines tax of $6,006.32, for a total of $123,777.32, less Heath's ten percent commission of $11,777.10.[6]  (*Id.*).  SpawMaxwell's Chief Financial Officer testified in his deposition that although the Heath invoice was hard to read, he did not see a statement indicating that the invoice discharged the entire amount owed by SpawMaxwell and he did not contend that the invoice made such a statement.  (Docket Entry No. 85, Ex. B, Deposition of Thomas Flaherty, at 98:16–20; 99:13–17).  The due date for payment of the Heath invoice was July 18, 2004.  (Docket Entry No. 85, Ex. A).  It is undisputed that GSM paid the Heath invoice with the $123,777.32 it had received from SpawMaxwell in March 2004.  (Docket Entry No. 88, Ex. A, Affidavit of Tom Flaherty, Ex. C).

Steadfast argues that these two invoices were not an "unmistakable communication to SpawMaxwell that tender of a lesser sum is upon the condition that acceptance will constitute satisfaction of the entire amount owed under the policy."  (Docket Entry No. 85, at 5).  Steadfast asserts that there is no language stating that it agreed to accept a lesser

---

[6] $117,771.00 (gross premium) - $11,777.10 (commission) = $105,993.90 (net premium) + $6006.32 (stamping fee and surplus lines tax) = $112,000.22

payment as full discharge of the amount owed or that SpawMaxwell's payment of the invoice amount would be a full satisfaction of the amount owed.  (*Id.*).  SpawMaxwell argues that "at a minimum, there is a fact issue as to whether an implied accord was reached in light of the surrounding circumstances." (Docket Entry No. 88, at 4).  SpawMaxwell emphasizes that the amount owed was disputed, SpawMaxwell sent its position in writing to Heath, which "sent the one and only invoice Heath ever issued based on the audit," and SpawMaxwell paid that invoice.  (*Id.*).  SpawMaxwell argues that the Heath invoice was an "accord" because "there is not a single reference to a disputed amount or some other amount due that would not be included in the 'Total Due' for the audit." (*Id.*).  SpawMaxwell contends that because Heath – Steadfast's agent – never sent another invoice or demand, SpawMaxwell's payment to Heath was an accord and satisfaction with Steadfast.  In response, Steadfast notes that it sent SpawMaxwell a letter on October 25, 2004 demanding payment of $518,212.22, the disputed portion of the $616,551.00 amount calculated as owing based on the audit of the subcontractors' insurance.  (Docket Entry No. 36, Ex. B, Affidavit of Sheryl Totzke).

The summary judgment evidence in the record does not raise a fact issue material to determining whether there was an accord and satisfaction.  The invoices did not unmistakably communicate to SpawMaxwell that tendering the $117,771.00 amount to Steadfast was on the condition that acceptance would constitute satisfaction of the entire amount owed.  Neither the Heath invoice nor the GSM invoice indicated that Steadfast agreed to discharge the entire $616,551.00 owed through payment by SpawMaxwell of the lesser amount.  Nor did the invoices state that the amount paid by SpawMaxwell would be

in full satisfaction of the entire amount owed.  The facts surrounding the Heath invoice do not "irresistibly" point to the conclusion that the parties agreed to a complete discharge of the amount owed by agreeing to the amount due under the Heath invoice.  The amount due under the Heath invoice was the same as the amount due under the GSM invoice.  The payment that GSM made on the Heath invoice was with the funds SpawMaxwell had sent to GSM in satisfaction of the GSM invoice, which stated that it was for the "undisputed part of final audit."  No accord and satisfaction of the disputed part of the final audit can be implied from these facts.  Steadfast is entitled to the summary judgment it seeks on SpawMaxwell's accord and satisfaction defense. *See Gilliland v. Cornell Companies*, *Inc.*, 2008 WL 485353, at *11 (S.D. Tex. Nov. 10, 2008) (granting summary judgment on accord and satisfaction defense where defendant failed to present evidence of an unmistakable communication that performance of the new agreement would distinguish the old obligation and the circumstantial evidence of the parties' intent did not "irresistibly" point to an accord and satisfaction); *Richardson v. Allstate Texas Lloyd's*, 235 S.W3d 863, 865 (Tex. App.—Dallas, 2007, no pet.) (finding insufficient evidence of an accord and satisfaction where insured made homeowner's insurance claim, insurer issued insured a check which "bore no notation that it was a full or final payment of the claim," and insured challenged the payment in writing as insufficient but "eventually cashed the check after a trial date was set").

Because Steadfast is entitled to judgment as a matter of law that there was no accord and satisfaction, SpawMaxwell's counterclaim for breach of contract fails.  Under Texas law,

the elements of a breach of contract claim are the existence of a valid contract, the plaintiff's performance or tendered performance, the defendant's breach of the contract, and damages resulting from the breach. *Case Corp. v. Hi-Class Bus. Sys. of Am.*, *Inc.*, 184 S.W.3d 760, 769 (Tex. App.—Dallas 2005, pet. denied); *Roof Sys.*, *Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 442 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The elements of a valid contract are: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Roman v. Roman*, 193 S.W.3d 40, 50 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Neither of the invoices and payments that SpawMaxwell relies on as a contract satisfies these elements. The invoices were not offers to discharge the entire amount SpawMaxwell allegedly owed Steadfast by a lesser payment. There is no evidence of a meeting of the minds on the essential terms of an accord and satisfaction. Steadfast is entitled to judgment as a matter of law on SpawMaxwell's accord and satisfaction defense and on its counterclaim for breach of contract.

### D.    SpawMaxwell's Deceptive Insurance Practices Counterclaims

SpawMaxwell counterclaimed alleging deceptive insurance practices under § 541.061 of the Texas Insurance Code and § 17.46(b)(12) of the Texas Business and Commerce Code. (Docket Entry No. 68). Under the Texas Insurance Code, it is "an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by: making an untrue statement of material fact . . . [or] making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact." TEX. INS. CODE §

541.061 (internal punctuation omitted).  Under the Texas Deceptive Trade Practices Act (DTPA), it is a false, misleading, or deceptive act to "represent[] that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."  TEX. BUS. & COM. CODE § 17.46(b)(12)

SpawMaxwell's counterclaims are based on pre-audit, audit, and post-audit actions taken by Steadfast.  SpawMaxwell alleged that before it purchased the Policy, Steadfast either failed to disclose the rate and premium to be charged and the coverage to be provided or made statements about the premium, rates, and coverage "in such a way that a reasonable person would come to a false conclusion."  (Docket Entry No. 68, at 8).  SpawMaxwell alleged that Steadfast represented that the premium would be $1.69 per $1,000.00 in gross receipts and that SpawMaxwell relied on this representation when it purchased the Policy and paid the initial premium.  (*Id.*).  SpawMaxwell alleged that an unenforceable penalty was "[b]uried in an unsigned endorsement to the policy" that "entirely changed the nature of the policy."  (*Id.*).  With respect to the audit, SpawMaxwell alleged that "Steadfast's goal in performing the audit was to drive Steadfast's earned premiums as high as possible."  (*Id.*, at 9).  SpawMaxwell alleged that Steadfast's auditor wrongfully concluded that approximately 200 subcontractors were missing insurance certificates and that SpawMaxwell had provided the auditor with "almost all of the insurance certificates" that the auditor claimed were missing.  (*Id.*).  With respect to post-audit actions, SpawMaxwell alleged the following misrepresentations:  Steadfast's February 2004 invoice for additional premium based on the audit, the Heath invoice and SpawMaxwell's payment of $117,771.00 in July 2004,

28

Steadfast's October 25, 2004 demand for the $518,212.22 it claimed SpawMaxwell still owed, Steadfast's filing of this lawsuit on August 23, 2006, and Steadfast's allegations in this lawsuit that SpawMaxwell owes $518,212.22 under the Subcontractors Warranty Endorsement.  (*Id.*, at 10-11).

## 1.    Are SpawMaxwell's Counterclaims Barred By Limitations?

Steadfast asserts that SpawMaxwell's deceptive insurance practices counterclaims are subject to a two-year statute of limitations that began to run when the alleged deceptive act occurred or when SpawMaxwell discovered or, in the exercise of reasonable diligence, should have discovered, the allegedly deceptive acts.  SpawMaxwell filed its DTPA counterclaim on March 9, 2007 and its Texas Insurance Code counterclaim on January 12, 2008, both more than two years after the pre-litigation actions forming the basis of SpawMaxwell's claims.  Steadfast also argues that it cannot be held liable for actions taken during this litigation, making the date it filed this lawsuit irrelevant for limitations purposes.

SpawMaxwell responds that its deceptive insurance practices counterclaims are "not subject to a plea of limitation" because under Texas Civil Practice & Remedies Code § 16.068, the counterclaims relate back to SpawMaxwell's original pleading.  SpawMaxwell argues that because the counterclaims arise out of the same insurance transaction that was the subject of the original answer filed on September 21, 2006 and the second amended answer filed on March 9, 2007, the January 12, 2008 third amended answer and counterclaim relate back.  (Docket Entry No. 10).  SpawMaxwell argues that for the purpose of limitations, its claims should be separated into "pre-litigation" and "litigation," divided by the date this

lawsuit was filed, August 23, 2006.  SpawMaxwell argues that the "pre-litigation" deceptive insurance practices it complains of in the third amended answer and counterclaim occurred within two years before September 21, 2006, when it filed its original answer.  As to the "litigation" deceptive insurance practices, SpawMaxwell argues that these took place after this lawsuit was filed and within two years before the third amended answer and counterclaim were filed.  SpawMaxwell argues that Steadfast is not immune from liability for violating the Texas Insurance Code merely because the representations that constitute the violations occurred within a judicial proceeding.

Citing *Flukinger v. Straughan*, 795 S.W.2d 779, 787 (Tex. App.—Houston [14th Dist.] 1990, writ denied), Steadfast responds that SpawMaxwell's claims do not relate back to the original answer because, under Texas law, the relation-back doctrine "does not permit an untimely counterclaim to relate back to an answer containing defensive pleadings" with no counterclaims or any grounds for an independent cause of action.  (Docket Entry No. 89, at 6).  Steadfast argues that, under Texas law, the relation-back doctrine can only apply to SpawMaxwell's first amended answer and counterclaim, filed March 9, 2007, in which it sought relief for DTPA violations.  According to Steadfast, SpawMaxwell's claims are barred because they all accrued before March 9, 2005.  SpawMaxwell replies that *Flukinger* was based on a general denial, which is not permitted under the Federal Rules of Civil Procedure, and asserts that relation-back applies because SpawMaxwell's "original pleadings contain a litany of direct indications that support the fact its subsequent counterclaims are from the same transaction or occurrence as its original answer." (Docket Entry No. 91, at

7).

SpawMaxwell's counterclaims are subject to a two-year limitations period.  Claims for misleading or deceptive acts under the DTPA and the Texas Insurance Code must be filed within two years "after the date on which the . . . [unlawful] act or practice occurred or within two years after the person bringing the action discovered or, in the exercise of reasonable diligence, should have discovered the occurrence of the [unlawful] act or practice." TEX. INS.CODE § 541.162; TEX. BUS. & COM.CODE § 17.565.

Limitations does not begin to run until a cause of action accrues.  *Houston Endowment*, *Inc. v. Atlantic Richfield Co.*, 972 S.W.2d 156, 159 (Tex. App.—Houston [14th Dist.] 1998, no pet.).  Generally, a cause of action accrues when facts come into existence that authorize a party to seek a judicial remedy.  *Johnson & Higgins of Tex.*, *Inc. v. Kenneco Energy*, *Inc.*, 962 S.W.2d 507, 514 (Tex. 1998) (citing *Murray v. San Jacinto Agency*, *Inc.*, 800 S.W.2d 826, 828 (Tex. 1990)).  In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or whether all resulting damages have yet to occur.  *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996).  When the discovery rule applies, a cause of action does not accrue until the plaintiff knows, or should know with the exercise of reasonable diligence, the facts giving rise to his claim.  *Wagner & Brown*, *Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001).  The discovery rule is a "very limited exception to statutes of limitations."  *Colonial Penn. Ins. v. Mkt. Planners Ins. Agency*, *Inc.*, 157 F.3d 1032, 1034 (5th Cir. 1998) (internal quotations omitted); *Computer Assocs. Int'l*, *Inc. v. Altai*, *Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).  It applies only when the

nature of the injury suffered by the plaintiff is both inherently undiscoverable and objectively verifiable.   *Wagner & Brown*, 58 S.W.3d at 734.   An injury is not "inherently undiscoverable" simply because a plaintiff failed to discover it within the applicable limitations period. *Id.* at 735.  Rather, the focus is on the nature of the injury itself – whether it is of the type that generally is discoverable by the exercise of reasonable diligence.  *Id.* at 734-35.

A cause of action based on an insurer's misrepresentation or failure to disclose in connection with the sale of an insurance policy accrues when the policy is issued.  *See Mauskar v. Hardgrove*, No. 14-02-00756-CV, 2003 WL 21403464, at *3 (Tex.App.—Houston [14th Dist.] June 19, 2003, no pet.).  An insured has a duty to read the policy and is charged with knowledge of the policy's terms and conditions.  *Ruiz v. Gov't Employees Ins Co.*,  4 S.W.3d 838, 841 (Tex. App.—El Paso 1999, no pet.); *Amarco Petroleum, Inc. v. Tex. Pac. Indem. Co.*, 889 S.W.2d 695, 699 (Tex. App.—Houston [14th Dist.] 1994, writ denied).  When the insured receives the written policy, it has sufficient facts in its possession to seek a legal remedy based on an alleged misrepresentation about the policy by the insurer.  *Mauskar*, 2003 WL 21403464, at *3.

The *Mauskar* case is instructive.  In *Mauskar*, the plaintiff insured purchased four separate life insurance policies between 1982 and 1992. *Id.*, at *1.  The plaintiff claimed that he explained to the insurer that he wanted policies that would pay approximately two or three times the death benefit when he reached the age of 65 and that the insurer represented to him that the policies met that requirement. *Id.*  It was undisputed that the written policies did not

state that the insured would be paid two to three times the face value.  The plaintiff turned

65 in 1997 and cashed in the policies in 1999, but did not receive the returns he expected.

*Id.*  He sued the insurer in 2000 for negligent procurement, negligent misrepresentation,

fraud, and violations of the DTPA and Texas Insurance Code.  *Id.*  The court held that

limitations barred the claims because they accrued when the policies were purchased and the

insurer allegedly misrepresented that the policies would pay two to three times their face

value at age 65, and not when he cashed in the policies and learned the full extent of the

injury.  *Id.*, at *3.  The court concluded that had the plaintiff "read the policies at the time he

purchased them, he would have known that the policies were not going to meet his alleged

pay-out expectations."  *Id.*  The court also held that the discovery rule did not apply.  The

plaintiff's injury "was not inherently undiscoverable because he easily could have discovered

his injury by reading the policies."  *Id.* at *4.; *see also Franco v. Slavonic Mut. Fire Ins.

Ass'n*, 154 S.W.3d 777, 789 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding that

the insured's claims for misrepresentation, fraud, and violations of DTPA and Texas

Insurance Code stemming from alleged misrepresentations the insurer made when the policy

was sold accrued at that time); *Sabine Towing & Transp. Co. v. Holliday Ins. Agency*, *Inc.*,

54 S.W.3d 57, 63 (Tex. App.—Texarkana 2001, pet. denied) (holding that the limitations

period for an insured's claim of negligent misrepresentation in procuring insurance expired

two years after the insured first received the certificate of insurance).

SpawMaxwell's counterclaims for Steadfast's "pre-audit" and "audit" acts are barred

by limitations.  The claims based on Steadfast's alleged failure to disclose the premium to

be charged and the coverage to be provided or Steadfast's alleged misrepresentations about the premium, rates, and coverage under the Policy accrued on May 29, 2002, when the written Policy was issued. The limitations period for those claims ended on May 29, 2004, well before this lawsuit was filed and SpawMaxwell filed an answer and counterclaim. SpawMaxwell's claims based on alleged deceptive acts or practices in connection with the audit accrued no later than March 22, 2004, when SpawMaxwell was aware of and disputed the audit's results. At that point, there were facts in existence "that authorize[d] [SpawMaxwell] to seek a judicial remedy." SpawMaxwell's alleged injury was not inherently undiscoverable because SpawMaxwell had the results of the audit and its own copies of the subcontractors' insurance certificates to compare against the audit results. Even if the relation-back doctrine applied and SpawMaxwell's counterclaims relate back to the original answer filed on September 21, 2006, the claims based on "pre-audit" and "audit" acts would still be barred by limitations because they accrued more than two years before September 2006.

With respect to "post-audit" acts, SpawMaxwell is barred by limitations from pursuing claims based on Steadfast's February 24, 2004 invoice to SpawMaxwell, Steadfast's May 11, 2004 demand for payment, and the June 2004 Heath invoice. SpawMaxwell's counterclaims based on these alleged misrepresentations accrued when these representations were made. At that time, SpawMaxwell was already aware of Steadfast's interpretation of, and reliance on, the Subcontractors Warranty Endorsement and the audit results. These counterclaims fall outside the limitations period even if the counterclaims relate back to the

34

original answer filed on September 21, 2006.

SpawMaxwell's counterclaim based on Steadfast's October 25, 2004 demand for payment is also time-barred unless SpawMaxwell's January 12, 2008 amended answer and counterclaims relate back to its September 21, 2006 original answer. Under Rule 15(c), "[a]n amendment to a pleading relates back to the date of the original pleading" in two circumstances potentially applicable here. First, an amendment relates back if "the law that provides the applicable statute of limitations" permits it. FED. R. CIV. P. 15(c)(1)(A). If state law provides the statute of limitations and state law "affords a more forgiving principle of relation back than the one provided in th[e] rule," the state law applies. FED. R. CIV. P. 15 (Advisory Committee's Note, 1991 Amendments). Texas law provides the applicable limitations period. Texas law does not, however, permit relation back of a counterclaim when, as here, the defendant's original answer was merely a defensive pleading and did not contain a counterclaim or independent grounds for a cause of action. *See Flukinger*, 795 S.W.2d at 787.

The second way in which Rule 15(c) relation-back might apply occurs when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." FED. R. CIV. P. 15(c)(1)(B). "The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 159 n.3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984). The relation-back doctrine "does not extend the

limitations period, but merely recognizes that the purposes of the statute are accomplished by the filing of the initial pleading." *Kansa Reinsurance Co.*, *Ltd. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1367 (5th Cir. 1994) (citation omitted). In deciding whether an amended pleading relates back to the original pleading, "the linchpin is notice, and notice within the limitations period." *Texas Clinical Labs*, *Inc. v. Leavitt*, 535 F.3d 397, 406 n.19 (5th Cir. 2008) (quoting *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 173–75 (5th Cir. 1991)); *see also Stevelman v. Alias Research*, *Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (stating that "the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading").

In applying Rule 15(c) to a counterclaim, courts examine whether there is "a common core of operative facts in the two pleadings" and "'whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds.'" *Cornerstone Systems*, *Inc. v. Knichel Logistics*, *L.P.*, No. 2:03cv584, 2006 WL 2471531, at *14 (W.D.Pa. Aug. 24, 2006) (quoting *USX Corp. v. Barnhart*, 395 F.3d 161, 167 (3d Cir. 2004)). "So long as [a] counter-defendant had adequate notice of the transactions forming the basis for the amended claim, relation back is appropriate." *Nordco*, *A.S. v. Ledes*, No. 95 Civ. 7753, 1999 WL 1243883, at *7 (S.D.N.Y. Dec. 21, 1999). Because "an answer without counterclaims typically does not provide much 'notice' of anything, other than the defendant's general denial of the plaintiff's allegations," in such a circumstance the inquiry is not narrowly focused on the content of the original pleading, "but

on the broader, more fundamental question of whether defendants were aware that the matters giving rise to the counterclaims would be at issue in [the] litigation." *Rubin v. Valicenti Advisory Services, Inc.*, 471 F.Supp.2d 329, 336 (W.D.N.Y. 2007) (noting that "it seems unwise to place undue emphasis on the particular way in which notice is received" and that the better approach "is to determine whether the adverse party, viewed as a reasonably prudent person, ought to have been able to anticipate or should have expected that the character of the originally pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question," (quoting 6A CHARLES A. WRIGHT *et al*, FEDERAL PRACTICE & PROCEDURE, § 1497 (2d ed. 1990))).

SpawMaxwell's counterclaim for deceptive insurance practices based on Steadfast's October 25, 2004 demand for payment relates back to the original answer and is not barred by limitations. The counterclaim arises out of the same core of operative facts that are asserted in the original answer. Although SpawMaxwell's original answer did not expressly allege misrepresentations by Steadfast, the answer made clear that, as Steadfast knew, SpawMaxwell disputed its interpretation of the Policy and the results of the audit. Steadfast could reasonably have expected that SpawMaxwell would use Steadfast's demand for payment as the basis to counterclaim for violations of the DTPA and the Texas Insurance Code. The counterclaim, filed on January 12, 2008, relates back to the September 21, 2006 original answer. *See American Telephone and Telegraph Co. v. Delta Communications Corp.*, 114 F.R.D. 606, 614 (S.D. Miss. 1986) (allowing a counterclaim that alleged illegal

37

rates to relate back to the original complaint that disputed the rates charged).[7]

SpawMaxwell's counterclaim for deceptive insurance practices based on Steadfast's October 25, 2004 demand for payment is not barred by limitations.  And SpawMaxwell's claims based on statements made in this lawsuit are not time-barred because they accrued on August 23, 2006 or later and SpawMaxwell's counterclaim was filed on January 12, 2008.

The parties' arguments as to whether these counterclaims may proceed on the merits are examined below.

### 2.    Steadfast's October 25, 2004 Demand for Payment?

Steadfast argues that the record does not raise a fact issue as to whether its October 25, 2004 demand for payment was a misrepresentation under the Texas Insurance Code or DTPA.  Steadfast points to SpawMaxwell's corporate representative's deposition, in which she testified that she did not know of any representations Steadfast had made to SpawMaxwell.  (Docket Entry No. 85, at 14–17).  Steadfast also argues that there is no

---

[7] Courts have also held that when a party seeks leave to add an omitted counterclaim under Rule 13(f), the counterclaim relates back to the date of the original answer when the counterclaim arises out of the same transaction that was pleaded in the answer and there is no prejudice to the opposing party's ability to defend the merits of the counterclaim.  *See*, *e.g.*, *Banco Para El Comercio Exterior De Cuba v. First Nat'l City Bank*, 744 F.2d 237, 243 (2d Cir. 1984); *Resorts and Motel Advancement Dev. Agency*, *Ltd.*, *v. Sloan*, 160 F.R.D. 449, 451 (S.D.N.Y. 1995); *see also* 6 CHARLES A. WRIGHT *et al*, FEDERAL PRACTICE & PROCEDURE § 1430 (2d ed. 1990) ("Once the standard set forth in Rule 13(f) is satisfied and leave of court to set up the omitted counterclaim by amendment has been granted, the remaining provisions of Rule 15 should be fully applicable and the amendment should relate back if it meets the test provided by Rule 15(c)."); *but see Stoner v. Terranella*, 372 F.2d 89, 91 (6th Cir. 1967) ("We conclude that the remedies provided by [Rules 13(f) and 15(a)] are mutually exclusive. . . . Consequently, since Rule 15(c) is only applicable to amendments made pursuant to Rule 15(a) . . . amendments made pursuant to Rule 13(f) do not relate back to the original pleadings.").

evidence in the record that any act or representation caused SpawMaxwell damages. SpawMaxwell responds that  Steadfast "represented that the insurance policy confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."  (Docket Entry No. 88, at 14–15).  SpawMaxwell contends that the amount Steadfast seeks in this lawsuit is illegal because it is excessive, unreasonable, and unfairly discriminatory.

SpawMaxwell's claim based on the October 25, 2004 demand for payment fails as a matter of law.  It is undisputed that Steadfast charged SpawMaxwell $518,212.22 based on the $20 per $1,000 of "uninsured/underinsured subcost" rate that was listed in the Subcontractors Warranty Endorsement and the results of the audit showing how many subcontractors were underinsured.  SpawMaxwell's counterclaims based on the audit are time-barred.  Even assuming, however, that the counterclaims based on the audit were not barred by limitations, SpawMaxwell has not presented evidence raising a fact issue as to whether Steadfast charged SpawMaxwell for the additional disputed amount knowing that the audit results used to calculate the amount were incorrect.

SpawMaxwell asserts that it photographed "a pile of certificates several inches high representing insured subcontractors with names beginning with the letters A-J that were not reflected  in the results of [the] audit" and sent the photograph to Steadfast.  (Docket Entry No. 88, at 12-13).  The fact that Steadfast received the photograph of insurance certificates after the audit, (Docket Entry No. 88, Ex. 1, Affidavit of Thomas Flaherty, Ex. A), does not mean that it knew the audit results were incorrect and that it "misrepresented" the amount

owed because that amount was calculated using an "incorrect" number of underinsured subcontractors.  Steadfast used the results of the audit it conducted and the formula set out in the Policy's Subcontractors Warranty Endorsement to calculate the amount it demanded from SpawMaxwell on October 25, 2004.  That demand does not misrepresent the rights, remedies, or obligations in the Policy.  This court's later determination that the premium-charge provision in the Subcontractors Warranty Endorsement is an unenforceable penalty does not mean that the Steadfast's payment demand in October 2004, calculated under the $20 per $1,000 of "subcost" rate set out in the Endorsement, was a "misrepresentation" or a statement that the Policy confers rights, remedies, or obligations that are prohibited by law. This court has concluded that the Code provision SpawMaxwell invokes, prohibiting rates that are excessive, inadequate, unreasonable, or unfairly discriminatory for the risks to which they apply, does not apply to the surplus lines insurance contract at issue in this case. Steadfast did not represent that SpawMaxwell owed an amount prohibited by law.  Because Steadfast's demand was not a "misrepresentation" under the Code or DTPA, SpawMaxwell's counterclaim based on the payment demand fails as a matter of law.  *See Tri-Legends Corp. v. Ticor Title Ins. Co. of California*, 889 S.W.2d 432, 439 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (affirming summary judgment dismissing DTPA and Insurance Code claims that were based on the allegation that the defendant title company misrepresented who "record title" to the land "appeared to be in" when title company issued title policy commitment because, as a matter of law, title was in the name of the party listed in the policy so no misrepresentation was made).

40

### 3.    Steadfast's Allegations and Statements in this Lawsuit?

SpawMaxwell alleges that the following statements or representations by Steadfast in filings in or papers related to this suit are deceptive acts or practices as defined by the Texas Insurance Code: the August 23, 2006 representation in the complaint that SpawMaxwell owed $518,212.00 in additional premium; the August 10, 2007 representation that SpawMaxwell owed more than $1,500,000.00 in additional premium and the demand for $661,053.00 in exchange for release of all claims; and Steadfast's failure to disclose to SpawMaxwell that it did not pay premium taxes on the premiums it seeks in this lawsuit. (Docket Entry No. 68, ¶¶ 73-80).

Steadfast argues that it cannot be liable for "bringing a lawsuit, sending a settlement offer, and providing alternative damage theories" because it is protected by the judicial proceeding privilege.  (Docket Entry No. 93, at 3).  Steadfast cites several Texas cases for the proposition that it is immune from liability for any statements or representations made in this lawsuit, including statements made in court, hearings, depositions, affidavits, and pleadings in the case, because such statements are protected by an absolute privilege for statements made in a judicial proceeding.  SpawMaxwell argues that these cases are distinguishable because they involve immunity from common-law torts, not from statutorily-imposed liability.

The absolute privilege of parties and witnesses to participate in judicial proceedings without having to answer civil actions in damages for libel or slander is well established in Texas law. *See Runge v. Franklin*, 72 Tex. 585, 10 S.W. 721 (1889). "Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942). The privilege promotes the public policy that "[c]itizens ought to have the unqualified right to appeal to the civil courts for redress, without fear of being called to answer in damages for libel." *Runge*, 72 Tex. at 590. Although the Texas Supreme Court has stated that "[t]his privilege extends to any statement made by the judge, jurors, counsel, parties or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case," *James v. Brown*, 637 S.W.2d 914, 917–18 (Tex. 1982), the Court has not held that this privilege bars all civil causes of action arising from communications made during the course of a judicial proceeding. *See Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 995 n. 8 (5th Cir. 1999) (recognizing that "[i]t is unclear whether, under Texas law, absolute immunity bars all causes of action from communications during a . . . judicial proceeding").

Most of the cases applying the judicial proceeding privilege involve defamation claims. But Texas courts have recognized that "the judicial communication privilege cannot be circumvented by disguising a claim [for defamation] under a different label." *Laub v. Pesikoff*, 979 S.W.2d 686, 691–92 (Tex.App.—Houston [1st Dist.] 1998, pet. denied). The

privilege extends to claims based on legal theories besides defamation advanced to circumvent the policy behind the privilege, of allowing citizens to make statements in judicial proceedings without fear of answering in damages similar to those imposed for defamation claims. *Bird v. W.C.W.*, 868 S.W.2d 767, 771–72 (Tex. 1994).

In *Tulloch v. JPMorgan Chase & Co.*, 2006 WL 197009 (S.D. Tex. Jan. 24, 2006), the defendant asserted the judicial proceeding privilege in a breach of contract case. The court recognized that Texas law was unclear on whether the privilege extended beyond libel and slander claims to claims for breach of contract. *Id.*, at *3. After an exhaustive review of relevant Texas Supreme Court and intermediate appellate court decisions, the court made an *Erie* guess and held that these decisions made clear that the "Texas law of absolute privilege bars claims for defamation (i.e., libel and slander) and claims based on different legal theories when the essence of the claim at issue is damages that flow from defamatory communications made in the course of a judicial proceeding, but strongly suggest that the Texas Supreme Court would not extend the absolute privilege to claims that are not based on defamatory statements and do not seek 'defamation damages.'" *Id.*, at *5 (citing *Bird*, 868 S.W.2d at 771–72 (finding that the absolute privilege extends beyond civil suits in damages for libel and slander when the claims are indistinguishable from defamation claims and the damages sought are defamation damages flowing from the communications made during a judicial proceeding)).

The absolute privilege has been applied to many types of claims arising out of communications made in judicial proceedings, even though they were not labeled as

defamation claims.  But the privilege only extends to claims that essentially assert that the plaintiff suffered injury as a result of the communication or publication of statements made during a judicial proceeding for which the plaintiff seeks "defamation damages," which are damages for loss of reputation and mental anguish.  *See*, *e.g.*, *Texas Mutual Ins. Co. v. Ray Ferguson Interests, Inc.*, 2006 WL 648834, at *9 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (holding that the absolute privilege for statements made during a lawsuit applied to a deceptive insurance practices claim under the Texas Insurance Code because "although [plaintiff] did not plead defamation, its theory of damages was that its clients, creditors, and bonding companies abandoned it, in part, because of the [insurer's] allegations and assertions . . . made in the course of this judicial proceeding"); *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 259 (Tex.App.—Fort Worth 2004, pet. denied) (holding that the absolute privilege applied to a tortious interference with contract claim because the plaintiff sought "defamation-type damages based on the allegedly libelous communications"); *Laub*, 979 S.W.2d at 691–92 (holding that the absolute privilege applied to an intentional infliction of emotional distress claim because the essence of the claim was that the plaintiff was injured "as a result of the *communication* of allegedly false statements during a judicial proceeding") (emphasis in original).[8]

---

[8] Steadfast cites *Intel Corp. v. Intel-Logistics, Inc.*, 2006 WL 1517510 (S.D. Tex. May 30, 2006). In this case, the court concluded that the absolute privilege applied to bar the defendant's counterclaims for tortious interference and business disparagement based on the plaintiff's acts of filing the complaint and issuing subpoenas to third parties in discovery.  *Id.*, at *2.  Although the claims were not labeled as defamation claims, the defendant/counter-plaintiff sought damages for injuries to its business reputation.  *See id*, at *1 ("The tortious interference counterclaims allege that '[t]his lawsuit is now filed as part of Defendant's credit,' which has 'affected the company's ability to attract a very lucrative contract' and has led to

The judicial proceeding privilege does not apply to Steadfast's statements in this case. SpawMaxwell has not counterclaimed for defamation or for a claim that is essentially based on defamation.  A  defamatory statement is one that "is likely to lower [the person referred to] in the estimation of reasonable people and in particular to cause that person to be regarded with feelings of hatred, contempt, ridicule, fear, or dislike."  BLACK'S LAW DICTIONARY 428 (7th ed. 1999).  SpawMawxwell has not alleged that any of the statements made by Steadfast in this lawsuit have injured its reputation or caused others to regard it with hatred, contempt, ridicule, fear, or dislike.   And SpawMaxwell does not seek "defamation damages." SpawMaxwell seeks damages for premiums charged "in excess of that allowed by law" and "in excess of that allowed by the contract, and attorneys' fees incurred to defend" this lawsuit.  (Docket Entry No. 91, at 8).  These are not the type of damages commonly sought in defamation actions.  They are the damages authorized by the Texas Insurance Code for "a plaintiff who prevails in an action" for deceptive insurance practices.  *See* TEX. INS. CODE § 541.152 ("A plaintiff who prevails in an action under this subchapter may obtain: the amount of actual damages, plus court costs and reasonable and necessary attorney's fees."). The damages SpawMaxwell seeks do not result from the communication of allegedly false statements during a judicial proceeding.

---

defendant's bank putting 'a hold on the expansion of his credit line.' The business disparagement counterclaim alleges that because Intel issued a subpoena in the lawsuit to clients of Intel-Logistics, the lawsuit 'has slowed down the economic growth of the business.'")  Under the rule set forth in *Bird* and subsequent Texas cases, extending the judicial-proceeding privilege to the statements in the complaint and the subpoenas was appropriate.

There is no need to extend the privilege to Steadfast's statements in this litigation to avoid circumventing the policy behind the privilege.  SpawMaxwell has not recast a defamation claim as a deceptive insurance practices claim to circumvent the policy of allowing a party to resort to civil litigation without fear of having to answer for defamation-type damages.  Instead, SpawMaxwell seeks to recover for alleged misrepresentations about the additional amount owed as a result of the audit and the Subcontractors Warranty Endorsement.  SpawMaxwell's claims based on statements made in this lawsuit are not barred by the judicial proceeding privilege.

Steadfast next argues that "bringing a lawsuit, events during litigation, alternative damage theories, or an offer of settlement during litigation" are not actionable under the Texas Insurance Code because they do not involve trade practices or the business of insurance.  Steadfast cites § 541.001 of the Texas Insurance Code, which states that the Code's purpose is to "regulate trade practices in the business of insurance."  Steadfast argues that SpawMaxwell's counterclaim under § 541.061 fails because that section only applies to deceptive acts or practices "in the business of insurance."  TEX. INS. CODE. § 541.061.  Steadfast also argues that all representations it made in connection with the settlement offer – which, according to SpawMaxwell, is an August 10, 2007 representation that SpawMaxwell owed more than $1,500,000.00 in additional premium and a demand for $661,053.00 in exchange for release of all claims – are privileged under Federal Rule of Evidence 408.

It is clear that Steadfast's August 10, 2007 statements were made in an attempt to settle. Under Rule 408 of the Federal Rules of Evidence, evidence of "conduct or statements made in compromise negotiations regarding the claim" is not admissible "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." FED. R. EVID. 408. Material that is inadmissible will not be considered on a summary judgment motion because it would not establish a genuine issue of material fact if offered at trial. *See Pegram v. Honeywell*, *Inc.*, 361 F.3d 272, 285 (5th Cir. 2004). Accordingly, Steadfast's motion for summary judgment is granted as to SpawMaxwell's counterclaim for deceptive insurance practices based on the August 10, 2007 settlement offer.

SpawMaxwell's remaining allegations are based on the August 23, 2006 representation in the complaint that SpawMaxwell owed $518,212.22 in additional premium and Steadfast's alleged failure to disclose to SpawMaxwell that it did not pay premium taxes on the premiums it seeks in this lawsuit. Steadfast is entitled to summary judgment on the failure-to-disclose claim because Steadfast was not obligated to pay premium taxes on the amounts it seeks in this lawsuit. The damages for breach of the Subcontractors Warranty Endorsement that Steadfast seeks are not a "premium" under the Texas Insurance Code. And, for the same reasons as the October 25, 2004 demand for payment, SpawMaxwell's counterclaim based on the statement in the complaint that SpawMaxwell owed Steadfast $518,212.22 fails as a matter of law. There was no misrepresentation of the Policy terms because the amount Steadfast demanded in payment from SpawMaxwell was calculated

based on the rate provision in the Subcontractors Warranty Endorsement and the audit results.  Steadfast's motion for summary judgment on SpawMaxwell's deceptive insurance practices counterclaims is granted.

## IV.    Steadfast's Motion to Strike the Affidavit and Reports of Mark Crawshaw

SpawMaxwell designated Dr. Mark Crawshaw as an expert on actuarial rates.  In his first report, Dr. Crawshaw examined how the amount set by the formula "$20 per $1,000 of uninsured/uninsured sub cost" applied to the insurance obtained by the SpawMaxwell subcontractors.  (Docket Entry No. 37, Ex. B).  Dr. Crawshaw concluded that the $20 per $1,000 rate was reasonable for uninsured subcontractors but unreasonable for underinsured subcontractors whose Best's rating was A- or lower.  (*Id.*).  In a supplemental report, Dr. Crawshaw concluded that the $1.69 per $1,000 premium rate Steadfast charged under the Policy "is significantly higher than actuarially justified."   (Docket Entry No. 57). SpawMaxwell submitted Dr. Crawshaw's reports as summary judgment evidence of its damages for its deceptive insurance practices counterclaims.  (Docket Entry No. 91, Ex. 2).

Steadfast has moved to strike Dr. Crawshaw's first report as irrelevant to SpawMaxwell's damages for its deceptive insurance practices counterclaims.  (Docket Entry No. 94).  Steadfast argues that Dr. Crawshaw's first report, which involves amounts due under the Subcontractors Warranty Endorsement, is irrelevant to whether SpawMaxwell has incurred damages for alleged violations of the Texas Insurance Code because "SpawMaxwell has not paid the amounts . . . so it has not been damaged in any way." (Docket Entry No. 94, at 5).   Because this court concludes that Steadfast is entitled to summary judgment on

48

SpawMaxwell's deceptive insurance practices counterclaims, Steadfast's motion to strike Dr. Crawshaw's first report from the summary judgment record is denied as moot.

Steadfast has also moved to exclude Dr. Crawshaw's supplemental report, arguing that his opinion lacks foundation and is unreliable.  (Docket Entry No. 98).  Steadfast has requested a pre-trial *Daubert* hearing on the admissibility of Dr. Crawshaw's testimony.  (*Id.*).  SpawMaxwell has not responded to these motions.  Steadfast argues that the opinion in Dr. Crawshaw's supplemental report – that the $1.69 per $1,000 premium rate is significantly higher than actuarially justified and that a rate of $1.25 per $1,000 was more reasonable in 2002 – lacks foundation because Dr. Crawshaw "relied on facts that were not used, could not have been used, and would not have been used by Steadfast to develop the rate on the 2002–2003 policy."  (Docket Entry No. 98, at 2).  Steadfast points to Dr. Crawshaw's deposition testimony that in determining the actuarial justification for a 2002 rate, it would be proper for an actuary to use the information that was available in 2002.  Steadfast argues that Dr. Crawshaw's opinion is unreliable because he used information developed from the subsequent 2003 audit as well as estimates of exposures, not the actual exposures that Steadfast reviewed in determining the premium rate.

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the

49

witness has applied the principles and methods reliably to the facts of the case."  The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible.  *Moore v. Ashland Chem.*, *Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).  The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]."  *Skidmore v. Precision Printing & Packaging*, *Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786).   The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.  The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).  In making its reliability determination, the court should not decide the validity of the expert's conclusions, but instead consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594-95, 113 S.Ct. 2786; *Watkins v. Telsmith*, *Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Brumley v. Pfizer*, *Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001).

Dr. Crawshaw's opinions were formulated using actuarial principles published by the Casualty Actuarial Society.  (Docket Entry No. 91, Ex. 2).  The reports state that "actuarial

ratemaking is prospective in nature.  In other words, rates should be based on information available at the time the policy was written.  Any subsequent events (e.g., insolvency of an insurance company, subsequent emergence of unusually favorable or unfavorable claims experience) are irrelevant to the determination of an actuarially appropriate rate." (*Id.*).  Dr. Crawshaw's first report explained that insurance premium rates for construction risks "are often expressed either as a rate per $1,000 of payroll or else as a rate per $1,000 of subcontract cost." (*Id.*).  SpawMaxwell's exposure under the Policy included its exposure as a general contractor, primary coverage for affiliates of SpawMaxwell known as Drake Interiors and Star Specialties, and miscellaneous primary coverage.   SpawMaxwell's application for the Policy included estimates for the amounts of payroll or subcontract cost for each of these areas.   The 2003 audit contained the actual amounts of payroll or subcontract cost for each of SpawMaxwell's areas.

In his deposition, Dr. Crawshaw explained that in determining the reasonableness of a premium, he looked to the relative amounts of business among Drake, Star, and the subcontractors.   (Docket Entry No. 98, Ex. 3, Deposition of Dr. Mark Crawshaw, at 147:1–7).  Dr. Crawshaw testified that a premium rate is determined by calculating the individual rate for each type of exposure and then determining the weighted average among those types of exposures. (*Id.*, at 148:17–21).  He acknowledged that it is proper actuarial practice to look at the information available when the Policy was written and not subsequently available information. (*Id.*, at 146:18–24).  Dr. Crawshaw explained that the information he used to calculate the reasonableness of the $1.69 rate was available to

51

Steadfast in 2002, except for the exposure amounts covered by the Policy.  (*Id.*, at

148:12–21).  For those amounts, Dr. Crawshaw used the actual payroll and subcontract

amounts as determined in the 2003 audit.  Dr. Crawshaw's opinion that the $1.69 rate was

not actuarially justified and that a $1.25 rate was appropriate was based on the assumption

that the relative amounts of business among Drake, Star, and the subcontractors did not

significantly change between the time SpawMaxwell applied for the Policy in 2002 and the

2003 audit.  (*Id.*, at 149:1–4).  Dr. Crawshaw offered support for this assumption, noting that

the estimates in SpawMaxwell's application were very similar to the actual amounts

determined from the 2003 audit.  (*Id.*, at 153:9–10).  Specifically, in the Policy application,

SpawMaxwell estimated that Drake Interiors would have $5 million in payroll; the audit

showed $5.6 million.  In the application, SpawMaxwell estimated the subcontractor costs to

be $90 million; the audit showed $96 or $104 million.  (*Id.*, at 152:17–25).  Dr. Crawshaw

stated that because both amounts in the audit were "off" by about ten percent from the

estimate that was available in 2002, the weighted amounts of exposure were very similar for

purposes of determining the premium rate.  (*Id.*, at 153, 1–10).  Dr. Crawshaw testified that

because the estimates in the application did not differ much from the audit amounts that he

used, there would be only a small change in the appropriate rate if he used the application

estimates.  (*Id.*, at 147:8–13; 151:8–11).  Dr. Crawshaw testified that it would be "ideal" to

use the amounts that Steadfast actually used to rate the Policy, but he was not provided with

that information.  He did not know whether Steadfast used the estimates from the application

or information from a previous policy period to determine the $1.69 per $1,000 premium

rate. (*Id.*, at 149:20–23).  Dr. Crawshaw testified that his opinion was based on "acceptable actuarial principles" because it was based on the information Steadfast had in 2002 and, with respect to exposure amounts, all the information available to him when he issued his report. (*Id.*, at 146:14–17).

Dr. Crawshaw's opinion is sufficiently reliable to aid the jury in resolving a factual dispute.  The fact that he used the exposure amounts from the audit as opposed to the amounts that SpawMaxwell used to determine the premium rate, whether from the Policy application or from a previous policy period, does not make Dr. Crawshaw's opinion testimony inadmissible.  Dr. Crawshaw testified that the weighted exposure amounts he used did not vary much from the weighted exposure amounts estimated in the Policy application. His opinion is based on the assumption that the relative amounts of business among Drake, Star, and the subcontractors did not change much between 2002 and 2003.  It is also based on the implicit assumption that the relative amounts of business that Steadfast used to determine the $1.69 rate either came from the application estimates or from the previous policy period.  This assumption does not raise a question as to the admissibility of Dr. Crawshaw's opinion.  The sources of information for SpawMaxwell's exposures for the 2002-2003 Policy are the exposures from the 2001-2002 policy and the estimates in the 2002-2003 Policy application.  Dr. Crawshaw knew that SpawMaxwell had a policy with Steadfast for 2001-2002 under which the premium rate was $1.09 per $1,000.  Dr. Crawshaw also knew that Steadfast knew the relative amounts of business among Drake, Star, and the subcontractors when it determined that rate in 2001.  Dr. Crawshaw assumed that the relative

amounts of business did not change much from year to year, and the record does not support a conclusion that this assumption was erroneous or unfounded.  The fact that Dr. Crawshaw did not know and did not use the exposure amounts Steadfast actually used in determining the premium rate goes to the weight of his opinion, not its admissibility.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.  Dr. Crawshaw's opinion is sufficiently reliable to pass the Rule 702 standard.  Steadfast's motion to exclude Dr. Crawshaw's testimony is denied and Steadfast's request for a pre-trial *Daubert* hearing is denied as moot.

## V.     Conclusion

SpawMaxwell's motion for partial summary judgment that the insurance contract is unenforceable under § 101.201 of the Texas Insurance Code is denied and Steadfast's cross-motion for summary judgment that § 101.201 does not preclude Steadfast from enforcing the contract is granted.  Steadfast's motion for partial summary judgment on SpawMaxwell's affirmative defense that the insurance contract is illegal is granted.  Steadfast's motion for partial summary judgment on SpawMaxwell's affirmative defense of accord and satisfaction and SpawMaxwell's counterclaims for breach of contract and deceptive insurance practices is granted.  Steadfast's motions to strike Dr. Crawshaw's first report, to exclude his

testimony, and for a pre-trial *Daubert* hearing are denied.

SIGNED on March 30, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge